Gcm6secc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                   Plaintiff,
 5
               v.                          16 CV 6964(VSB)
 6
     CONTRARIAN PRESS, LLC, et al.
 7
                   Defendants.
 8
     ------------------------------x
 9                                         New York, N.Y.
                                           December 22, 2016
10                                         3:45 p.m.

11   Before:

12                     HON. VERNON S. BRODERICK,

13                                            District Judge

14                           APPEARANCES

15   U.S. SECURITIES AND EXCHANGE COMMISSION
          Attorneys for Plaintiff
16   BY:  HAIMAVATHI V. MARLIER
          TEJAL D. SHAH
17
     K&L GATES, LLP
18        Attorneys for Defendants Fraser and Contrarian
     BY:  MICHAEL QUINN
19

20

21

22

23

24

25
```

2

Gcm6secc

1          (Case called; in open court; telephone conference)

2          THE LAW CLERK:  Will the parties state their

3    appearance for the record, starting with the plaintiff.

4          MS. MARLIER:  Good afternoon, your Honor.  This is

5    Haimavathi Marlier and with me is my colleague Tejal Shah, and

6    we represent the Securities and Exchange Commission.

7          THE COURT:  Good afternoon.

8          MR. QUINN:  Good afternoon, your Honor.  Michael Quinn

9    from K&L Gates in Los Angeles, representing Defendant Scott

10   Fraser and also Defendant Contrarian Press.  Also on the line

11   to the extent we need any local need is Justin Roeber from K&L

12   Gates in New York.

13         THE COURT:  That is Justin Gruber?

14         MR. QUINN:  The last name is Roeber, R-o-e-b-e-r.

15         THE COURT:  Thank you.

16         This is Judge Broderick.  As my law clerk mentioned,

17   we're in my courtroom, and we have a court reporter here.  So

18   when you do speak, please identify yourself for the record.

19         Let me go over for the parties the correspondence I

20   have in connection with today's premotion conference.  I have

21   the November 21st letter from the defendants, two separate

22   letters from Defendant Fraser and from Contrarian Press the

23   joining in Fraser's premotion letter.  I have the November 28th

24   response from the SEC to the joint premotion letter and then I

25   have the SEC's December 1 premotion letter.  I have a

Gcm6secc

1    December 21st response to the SEC's premotion letter.

2              Is there anything else I should have in connection

3    with today's conference?

4              MS. MARLIER:  No, your Honor.  That is everything.

5              THE COURT:  From the defense?

6              MR. QUINN:  No, your Honor.  I think that is

7    everything.

8              THE COURT:  So as I understand it there are several

9    issues to discuss today.  One is the motion for either improper

10   venue or forum inconvenience and the other is the SEC's motion

11   with regard to service of the remaining individual defendant,

12   Mr. Yeung.

13             Am I missing any issues from the SEC?

14             MS. MARLIER:  No, your Honor.

15             THE COURT:  From the defense?

16             MR. QUINN:  No, your Honor, except with respect to the

17   venue motion, in the alternative there is a transfer of venue

18   for convenience.

19             THE COURT:  Yes.  Let's talk about the motions.

20   First, let's see if we can deal with the issue of service.  As

21   I understand it, the SEC has attempted to serve Mr. Yeung

22   through the Hague Convention; is that correct?

23             MS. MARLIER:  Yes, that is correct, your Honor.  Mr.

24   Yeung is a Canadian national and our efforts under the Hague

25   Convention have not been successful as detailed in our letter.

Gcm6secc

1          THE COURT:  Was there also a separate attempt to

2    contact an attorney that has represented him in some other

3    matters directly, or is that through the Hague Convention also?

4          MS. MARLIER:  It is direct, your Honor.  Mr. Yeung had

5    an attorney who is based in Vancouver, who represented him in

6    the investigation that preceded this litigation.  Upon the

7    filing of the complaint, another trial counsel here at the SEC

8    contacted Mr. Yeung's Canadian counsel and asked him whether he

9    was authorized to accept service of the complaint.  He

10   responded that he was not.  Recently on December 14th, counsel

11   stated to me via e-mail that he did not represent Mr. Yeung for

12   purposes of this litigation at all.

13         THE COURT:  Now, I understand an attempt was made

14   through the Hague Convention to serve and Mr. Yeung's mother

15   responded that he doesn't live at that location and that he has

16   moved.  Is that accurate?

17         MS. MARLIER:  That is the information that we have

18   from the Ministry of Justice for British Colombia.  They

19   returned some documents to us and that was their location.

20         THE COURT:  Other than the facts we have just

21   discussed is there any affirmative evidence that you have that

22   you believe that Mr. Yeung is avoiding service?

23         MS. MARLIER:  Based on the information that we have

24   seen from the Ministry, we believe that he may be avoiding

25   service.  We found it of note that his mother said she did not

Gcm6secc

1    have a forwarding address for him and she thought he moved to

2    Ontario.  Also during the investigation he provided to SEC

3    staff an e-mail address that he uses but he refused to provide

4    a mailing address.  Also his Vancouver based counsel was not

5    able to provide a mailing address to me for Mr. Yeung despite

6    the fact that that was his client.

7             THE COURT:  I know you have requested the alternative

8    service that has been requested and as I understand it relates

9    to the e-mail service; is that accurate?

10            MS. MARLIER:  Yes.  We have sort of a twofold

11   proposal, your Honor.  In the first instance we propose to use

12   the e-mail address that Mr. Yeung identified to the SEC staff

13   during the investigation for service purposes.  Our second

14   proposal would be to serve on Yeung's Vancouver based Canada

15   counsel.  We do believe that that counsel could then forward

16   that package to Mr. Yeung by e-mail or by mail, which would

17   satisfy due process requirements and also give Mr. Yeung the

18   opportunity to present any objections if he has any.

19            THE COURT:  As I understand it from the letter from

20   defense counsel, Mr. Quinn, you don't take a position with

21   regard to this.  So this is what we'll do with regard to the

22   service issue:  In light of the fact that Canada does not

23   prohibit service by e-mail and the facts that have been

24   developed as I understand it through the correspondence that

25   the SEC has sent to me that attempts to serve Mr. Yeung through

Gcm6secc

1    the Hague Convention and directly to an attorney that had

2    previously represented him have been unsuccessful, no

3    forwarding address or addresses have been uncovered for him,

4    other than the location where service has already been

5    attempted, I am going to allow for alternative service both by

6    e-mail and it probably makes sense for me have the name of the

7    attorney to whom service can be sent for correspondence.

8              MS. MARLIER:  I would need to check, your Honor, but

9    yes, it is by correspondence.  If your Honor would turn to

10   Docket No. 19, my December 1st letter to your Honor.  In the

11   ECs on page 3, there is an attorney there H. Roderick Anderson,

12   Esquire, and an e-mail address for Mr. Anderson.

13             THE COURT:  I will authorize service to Mr. Anderson

14   also in addition to the e-mail address.

15             Was it the SEC's intention to serve Mr. Anderson by

16   mail or were you going to do it e-mail?  I only have obviously

17   the e-mail address for him on the CC.

18             MS. MARLIER:  We propose to do it both by e-mail and

19   by international mail.

20             THE COURT:  I will indicate that in the order that I

21   issue.

22             So let's go now to the next issue, which is the motion

23   that the defendants intend to make relating to venue and

24   failing the venue motion to transfer the case for forum non

25   conveniens ground.  Let me initially ask whether there is an

Gcm6secc

1    agreement among the parties that -- this is a question for

2    Mr. Quinn -- that there were investors who purchased the EMPO

3    stock in the Southern District?

4         MR. QUINN:  Absolutely not.  There is no agreement on

5    that.  I guess more to the point from the allegations of the

6    complaint, any purchases or sale of Empowered Product stock are

7    irrelevant to the allegations against the defendants, which are

8    merely related to creating and disseminating promotional

9    materials.  It doesn't require any subsequent purchase or sale

10   of stock until shareholders or any subsequent purchase or sale

11   or stock simply do not matter.

12        THE COURT:  Are you saying for venue purposes it does

13   not matter?

14        MR. QUINN:  I am sorry?

15        THE COURT:  Are you saying for venue purposes it

16   doesn't matter?  Putting aside for a moment the promotional

17   materials, are you saying that the fact that the securities

18   were sold here is irrelevant for purposes of venue in this

19   case?

20        MR. QUINN:  I think two answers to that.  One, I think

21   for purposes of venue that shares were purchased or sold is not

22   a material fact.  So, yes, it is zero relevance that they were

23   purchased in New York.  If the shares were purchased in New

24   York then that would apply to any venue across the country.

25   They were not particularly solde in New York.  It was a

Gcm6secc

1   publically traded stock and so that factor would apply to any

2   district in the country.

3        THE COURT:  So would your position be similar to the

4   fact that the stock was quoted on the over-the-counter market

5   here, on the Bulletin?

6        MR. QUINN:  It would.  Over-The-Counter Bulletin Board

7   is not like the New York Stock Exchange where there is a floor

8   where shares are traded.  Over-The-Counter-Bulletin Board is

9   operated through a market maker.  Here the market maker was

10  based in Florida.  So transactions occurred between any

11  shareholders and a market maker in Florida.  That the Bulletin

12  Board has a home office in New York is again not at all related

13  to any of the allegations in this case.

14       THE COURT:  As I understand it with regard to the

15  allegation was there a Manhattan based stock promotion company

16  or companies that were hired?

17       MR. QUINN:  Notably the SEC's response says that

18  defendants, plural, engaged some stock promoters in New York

19  and paid stock promoters through a bank in New York.  The

20  defendants are plural, which is more than two.  I represent two

21  of the three.  And having been involved in this investigation

22  for three years, I know for a fact that neither defendant,

23  Contrarian Press nor Scott Fraser, engaged any stock promoters

24  in connection with the two stock promotions alleged in the

25  complaint, May 2012 and October 2012.  I don't know what

Gcm6secc

1    Defendant Nathan Yeung did, but I know that doesn't apply to

2    Defendant Scott Fraser or Defendant Contrarian Press.

3          THE COURT:  Let me ask this separately with regard to

4    the claim that certain of the statements, in other words,

5    through promotional materials actually were sent to the

6    Southern District.  Again, based upon what you said are you

7    saying that to the extent it occurred, it wasn't at the

8    direction of your two clients?

9          MR. QUINN:  That is exactly what I would say, and I

10   would have no way of knowing where somebody else sent those

11   materials.

12         THE COURT:  What is the relationship between

13   Contrarian and Mr. Fraser and Mr. Yeung?

14         MR. QUINN:  Mr. Fraser owns Contrarian Press.  The

15   relationship between Contrarian Press and Mr. Yeung was Mr.

16   Yeung did a consulting job for Contrarian Press, which was sort

17   of unconnected to any of the events alleged in the complaint

18   and the SEC disputes that from our perspective.

19         THE COURT:  One of the things that goes to the motion

20   itself that venue isn't proper here is if I decide that venue

21   is not proper, and I don't think I received a full letter on,

22   but I think, Mr. Quinn, you alluded to the possibility of

23   making a 12(b)(6) motion and the SEC's response to that was,

24   Well, we should brief it all at once.  But if I don't have

25   venue, I don't have jurisdiction so I am not really sure I can

Gcm6secc

1    reach the 12(b)(6) part of it.

2              Let me hear from the SEC with respect to the

3    connections to New York that support venue.

4              MS. MARLIER:  Sure.  Thank you, your Honor.  Not

5    surprisingly our view of this case is different than

6    Mr. Quinn's.  This is a case where a CEO orchestrated a

7    nationwide promotion of his own company, Empowered Products,

8    while giving the outside appearance that the promotions

9    actually came from independent third parties.  Venue is proper

10   here in the Southern District.  Acts constituting the violation

11   occurred here, including the use of Southern District and other

12   New York based stock promoters to disseminate misleading

13   promotions concerning Empowered Products.  Moreover, Contrarian

14   Press and Scott Fraser in our view do business here.  Empowered

15   Products holds itself out to be nationwide provider of certain

16   products and Contrarian Press based on its subscriber list has

17   subscribers here in New York.

18             Other facts that I think are important to venue are

19   that Mr. Fraser hired third-party like Defendant Nathan Yeung

20   in this case to conduct Empowered Products promotions and these

21   third parties, including Mr. Yeung, then hired stock promoters

22   located in the Southern District to disseminate those

23   promotions.  In fact, the most integral promoter in our view

24   for this case is located here in the Southern District.

25   Investors who bought and sold Empowered Products stock during

Gcm6secc

1    the period of the promotion -- I will actually back up.  After

2    the promotions there were spikes in volume where the trading

3    volumes increased in some cases dramatically and there are

4    investors here in New York who bought during those periods of

5    high trading.  Empowered Products is also quoted on OTC Link,

6    which is an inter-dealer quotation system located here in the

7    Southern District.  Empowered Products shares were deposited

8    into the Depository Trust Corporation, or DTC, which is also

9    located here in the Southern District.  Stock promoters were

10   paid through bank accounts located here in the Southern

11   District.

12          So we believe that all of these factors are more than

13   sufficient to provide venue here in the Southern District.  And

14   your Honor, I am sure you will ask this later, we also believe

15   this is the convenient forum based on how this case will end.

16          THE COURT:  Is there a contract between Contrarian or

17   Mr. Fraser on the one hand and Mr. Yeung on the other?

18          MR. QUINN:  There is not, your Honor.

19          THE COURT:  So Mr. Yeung was hired to do some

20   consulting work but without a contract; is that accurate?

21          MR. QUINN:  That's right.  While Mr. Yeung was in

22   Vancouver, British Columbia, and Mr. Fraser was in San Diego,

23   California.

24          MS. MARLIER:  Your Honor, from the SEC's perspective

25   we cannot answer that question because it is my understanding

Gcm6secc

1    that we have not been provided a contract one way or another

2    during the investigation.

3              THE COURT:  Mr. Quinn, since it appears that Mr. Yeung

4    was doing work for either Mr. Fraser or Contrarian, why

5    wouldn't he be an agent working on behalf of Contrarian or Mr.

6    Fraser?  Now, this is again assuming that he engaged the stock

7    promotion companies or worked on promoting the stock.

8              MR. QUINN:  There is a very significant issue with

9    respect to that assumption.  The work that Mr. Yeung did for

10   Contrarian Press was not at all related to the work that the

11   promotional materials that the SEC now alleges that Mr. Yeung

12   sent out.  That is why this case exists.  There was no

13   connection between Contrarian Press and this promotional work

14   that Mr. Yeung knew and Mr. Fraser knew nothing about it.  So

15   he certainly was not acting as an agent of Contrarian Press or

16   Mr. Fraser, which as I understand it is also what Mr. Yeung

17   says.

18             THE COURT:  What was he hired to do?

19             MR. QUINN:  He was hired in what is called lead

20   generation work, which is to build databases of potential

21   subscribers to news letters, and was paid via an invoice that

22   identified that specific task and the SEC does not dispute that

23   he did in fact performed that task and was paid for that task.

24             THE COURT:  I take it with regard to both the

25   assertions by the SEC and any information that the defendants

Gcm6secc

1   have that no one is making a request that there should be any

2   discovery or anything like that that occurs in advance of any

3   motion practice; is that correct?

4            MR. QUINN:  That is correct from the defendants'

5   perspective.  I don't think it is necessary.

6            THE COURT:  From the SEC?

7            MS. MARLIER:  We don't believe that discovery in

8   advance of the proposed motion is necessary.

9            THE COURT:  Let's talk about the second part to

10  defendants' motion if they are not successful on the venue

11  issue.  It is the inconvenient forum issue.  It seems as if

12  some of the same facts are going to factor into that also.

13  Obviously the plaintiff's choice of forum also being one of the

14  factors.

15           The SEC claims there are some witnesses.  You have

16  indicated the promotional entities.  Does the SEC know how

17  these promoters were paid?

18           MS. MARLIER:  Yes, your Honor.  I believe that for

19  most of the stock promoters we know how they were paid.  They

20  were paid through an entity that was set up specifically to pay

21  them by a longtime associate and employee of Mr. Fraser.

22           THE COURT:  Were they paid by check or wire transfer?

23           MS. MARLIER:  Mostly wire from what we can tell, your

24  Honor.

25           THE COURT:  The individual that you are talking about

Gcm6secc

1   was during the time period in question was.  Was that person an

2   employee of Contrarian?

3            MS. MARLIER:  Yes, your Honor, we believe so.  Yes,

4   she was an employee of Contrarian and has worked for some time

5   with Mr. Fraser.

6            THE COURT:  Mr. Quinn, is that something that your

7   clients dispute?

8            MR. QUINN:  Your Honor, I don't have the slightest

9   idea to whom the SEC is referring.

10            I was going to drawback to the complaint.  The

11   complaint identifies for instance Mr. Fraser's longtime

12   personal assistant who resides in San Diego, California.  Her

13   name is Liz Kern.  I certainly don't think they are referring

14   to her because I don't think there is any allegation that she

15   paid anybody, certainly not with her own funds.  The complaint

16   also talked about another longtime associate of Mr. Fraser's at

17   paragraph 40, and that is Ted Foth, also a resident of Southern

18   California and also Las Vegas.  The complaint at paragraph 43

19   refers to another associate of Fraser's.  That is Mr. Michael

20   Fagen, also a resident of Southern California.  It refers to

21   Contrarian Press employees at paragraph 60, Terri Fox and

22   Christina Siegel, both residents of San Diego, California.

23   From our perspective every witness that is identified within

24   this complaint has connection to Southern California or resides

25   in Southern California.  Not one resides anywhere near New

Gcm6secc

1    York.

2            THE COURT:  Obviously the fact that they are

3    identified and reside in Southern California does add credence

4    to your argument that there are a lot of witnesses in

5    California, but I think this is the case that in a motion for

6    inconvenient forum, it doesn't necessarily have to be the case

7    that the witnesses are named in the complaint itself.  If the

8    party seeking to oppose -- can't they put forward individuals

9    who reside in the New York area who are not named in the

10   complaint?

11           MR. QUINN:  I guess my response to that is certainly

12   the witnesses that are identified in the complaint would be

13   considered the material witnesses as opposed to incidental

14   witnesses.  The SEC's response that they have witnesses in New

15   York, Nevada, Texas, Illinois, Florida, Vermont, Delaware,

16   British Columbia, I have no idea who is in any of those states;

17   but I will assume that that is perhaps some stock promoters

18   that are going to testify to what somebody, may have been

19   Yeung, paid them to distribute an e-mail.  None of that is

20   relevant testimony.  None of that has anything to do with the

21   defendants, Scott Fraser and Contrarian Press.  Any witness

22   that is going to have anything to say about communications or

23   interactions with Defendants Scott Fraser and Contrarian Press

24   are in and around San Diego, California or Las Vegas, Nevada

25   where Empowered Products are.  I guess the material witnesses

Gcm6secc

1    are identified in the complaint and certainly more weight

2    should be afforded those witnesses than whatever incidental

3    witnesses the SEC might come up with in response to a motion to

4    say there are witnesses elsewhere.

5              THE COURT:  Let me ask this:  With regard to the

6    promoters or promoter alleged to be here in New York, did that

7    entity or person have any contact with any Contrarian

8    employees?

9              MR. QUINN:  I don't know who that promoter is.  So as

10   far as I know, absolutely not.

11             THE COURT:  SEC?

12             MS. MARLIER:  One moment, your Honor.

13             Yes, your Honor, the stock promoter in New York that

14   we view as most interval to this case had contact with both

15   Mr. Fraser and Mr. Yeung.  There are other stock promoters

16   located here in New York.

17             If your Honor would allow me, I would like to back up.

18   The characterizations of the SEC's complaint are not correct.

19   The SEC's complaint has clear allegations indicating that the

20   longtime employee of Mr. Fraser, Ms. Kern, set up an entity

21   called Crown Pacifica, which then made payments by wire

22   transfer directly to New York based stock promoters at the time

23   she was working for Contrarian Press.  The SEC's complaint also

24   makes clear that Mr. Yeung using a pseudonym was also working

25   for Contrarian Press and held himself out to be doing so.  The

Gcm6secc

 1    SEC identified more than just this one stock promoter however,

 2    your Honor, that is here in New York.  Without committing the

 3    SEC and with the understanding that discovery has not yet

 4    occurred, the SEC has identified at least four witnesses that

 5    are material that are here in New York.  They include two stock

 6    promoters and one potential investor.  There is another stock

 7    promoter located here.  We would need additional discovery to

 8    determine the scope of his testimony.  Certainly the other two

 9    we will be calling.  There are others on the east coast, at

10    least four others, in places like Delaware, Vermont and two in

11    Florida.

12         As I said earlier, your Honor, this involved a

13    nationwide promotion.  There are other witnesses who have

14    material highly relevant information that are in such neural

15    locations like Illinois and Texas.  To those witnesses you

16    cannot say whether New York is more convenient than San Diego.

17    They will have to get on a plane no matter what to the extent

18    they are issued a trial subpoena.  Discovery may enable the SEC

19    to establish contact between the entity Crown Pacifica, which

20    was established by Mr. Fraser's longtime employee Ms. Kern, and

21    other New York based stock promoters or east coast based stock

22    promoters.

23         THE COURT:  Mr. Quinn, with regard to the SEC's

24    suggestion that the venue transfer issue be briefed along with

25    the 12(b)(6) issue, I apologize if I missed it in the

1    correspondence, but what is your response with regard to that?

2            MR. QUINN:  I have a couple responses.  That seems to

3    make little sense for a couple of reasons.  First and foremost

4    by establishing, figuring out what the venue is going to be

5    first, we can assure the applicable law is cited in connection

6    with 12(b)(6) motion.  It doesn't do us any good to do a

7    12(b)(6) motion citing Second Circuit law if the venue has been

8    transferred to the Southern District of California.  It also

9    frankly prevents an argument from the SEC that time, expense

10   and resources have been devoted to a motion to dismiss and

11   therefore that favors the venue in New York over a transfer to

12   some other district, which I have seen that argument made by

13   the SEC in other cases.  It certainly seems to me to make sense

14   to determine the venue first and then file a 12(b)(6) motion.

15           THE COURT:  With regard to the first argument, I will

16   hear from the SEC in a moment.  With regard to the second

17   issue, Mr. Quinn, were I to allow the simultaneous briefing,

18   that issue is not an issue that I would give it any credence

19   to.  In other words, if I heard what you are saying that you

20   would be concerned that the SEC wants -- that in response to

21   the transfer motion that they would say that resources have

22   been expended here with regard to the motion to dismiss.

23   Again, if that is what you were saying, I wouldn't give that

24   argument any credence.  Quite frankly if I find that venue is

25   not appropriate here, the case is going to get transferred

Gcm6secc

1    without my reaching the 12(b)(6) issue and it will be for one

2    of my colleagues in California to decide that issue.

3            So let me hear from the SEC.  You can comment on the

4    second issue, but really it is the first issue relating to

5    briefing on the 12(b)(6) issue and what the applicable law

6    would be.

7            MS. MARLIER:  Thank you, your Honor.  We believe that

8    just for purposes of efficiency and convenience that a brief

9    setting forth of all the grounds that Mr. Fraser and Contrarian

10   Press wish to set forth for dismissal would be appropriate.

11           As we stated in our letter, we believe that venue is

12   proper here.  We believe that based on the case law that we

13   have reviewed and the facts in this case that any argument that

14   venue is improper has little to no chances succeeding.

15   Therefore, we believe it would be more efficient to put

16   everything in at once. Mr.  Quinn is going to have to cite

17   Second Circuit law anyway for the venue motion.

18           THE COURT:  This is what we are going to do with

19   regard to this particular issue and then we'll discuss timing:

20   I am going to first hear the venue and transfer issue for

21   several reasons.  Number one, it may be that the law in

22   California may be slightly different than the law here with

23   regard to certain things related to the 12(b)(6) motion.  More

24   critically I think is I don't have all the defendants here in

25   front of me.  Again, I don't know when and if Mr. Yeung appears

Gcm6secc

1    whether he would intend to file a 12(b)(6) motion, whether his

2    12(b)(6) motion that he would file would be the same legal

3    basis as Mr. Fraser and Contrarian.  I just don't know.  In

4    light of the fact that we don't have him here yet, I am going

5    to hold off on the 12(b)(6).  We'll brief the venue issue and

6    the transfer issue first.  Hopefully the service issue will be

7    resolved, in other words, Mr. Yeung will be appropriately

8    served and we'll have an appearance by an attorney here.  If

9    the other motion is fully briefed and I have made a decision on

10   venue and the transfer and it is going to stay here, then we

11   can discuss the 12(b)(6).  In light of the fact both in terms

12   of the issue that Mr. Quinn raised but more importantly that we

13   don't have the third defendant here, I am going to hold the

14   12(b)(6) briefing off for now.

15        Let me ask this:  Have the parties discussed a

16   schedule for the briefing of the motion for lack of venue and

17   transfer motion?

18        MS. MARLIER:  We have not, your Honor.

19        THE COURT:  Mr. Quinn, how much time do you need for

20   your opening brief?

21        MR. QUINN:  I am set to go to a jury trial at the end

22   of January.  If that is too long, I will find a way to get it

23   done during January.

24        THE COURT:  What is the nature of the trial?  How long

25   do you anticipate it being?

Gcm6secc

1          MR. QUINN:  It's a jury trial in state court in

2     California and it should last one week beginning January the

3     30th.

4          THE COURT:  My thought process was 30 days on the

5     opening brief.  Mid-February, Mr. Quinn?

6          MR. QUINN:  Yes.  That would be extremely appreciated.

7          THE COURT:  February 17th for the opening brief.

8          How much time would the SEC like for their opposition?

9          MS. MARLIER:  I believe we can do it in three week,

10    your Honor.

11         THE COURT:  March 10th.

12         Mr. Quinn, on reply?

13         MR. QUINN:  Two weeks, please, your Honor.

14         THE COURT:  Yes.  March 24th.

15         Once I see the papers, I will determine whether or not

16    I think oral argument will be helpful to me.  If I do, in all

17    likelihood I will issue an order indicating that, scheduling a

18    time for oral argument and also indicating in that order the

19    areas or topics or questions that I would like addressed.  It

20    is not all inclusive but areas that I would like the parties to

21    be prepared to discuss when we have the oral argument.

22         Is there anything else that we need to discuss at this

23    stage from the SEC?

24         MS. MARLIER:  I don't think so, your Honor.  Thank

25    you.

Gcm6secc

1          THE COURT:  Mr. Quinn?

2          MR. QUINN:  Nothing, your Honor.  Thank you.

3          THE COURT:  Thank you very much for getting on the

4     phone.

5                              o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25