Lara Shalov Mehraban
Sandeep Satwalekar
Haimavathi V. Marlier
Tejal D. Shah
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1055 (Marlier)
Email: MarlierH@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                        :

**SECURITIES AND EXCHANGE**
**COMMISSION,**
                        :

                **Plaintiff,**    :       **16 Civ. 06964 (VSB)**

                        :       **ECF CASE**

        **- against -**           :

                        :       **JURY TRIAL**
**CONTRARIAN PRESS, LLC, SCOTT S.**  :      **DEMANDED**
**FRASER, and NATHAN YEUNG**     :

                **Defendants.**  :

                        :
------------------------------------------------------- x

## AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its amended complaint against Defendants Contrarian Press, LLC ("Contrarian Press"), Scott S. Fraser ("Fraser"), and Nathan Yeung ("Yeung," and together with Contrarian Press and Fraser, "Defendants"), alleges:

## SUMMARY OF ALLEGATIONS

1.      From approximately September 2011, Fraser—the CEO of the penny stock issuer Empowered Products, Inc. ("EMPO")—concealed from the investing public his and EMPO's involvement with and funding of at least three separate promotional campaigns touting EMPO.

2.      As part of the first promotional campaign in September and October 2011, Fraser, who was also the writer and publisher of stock-picking newsletters, and Contrarian Press, Fraser's publishing company, made materially false and misleading statements about their relationship with EMPO.

3.      Fraser and Contrarian Press touted EMPO's business prospects and repeatedly recommended—in e-mails and/or hard-copy mailers—the purchase of EMPO shares. Specifically, Fraser and Contrarian Press authored and distributed highly-positive articles about EMPO's business without disclosing in those articles that (a) EMPO's CEO Fraser prepared and distributed the articles and owned and ran Contrarian Press; and (b) EMPO and Contrarian Press had entered into an "Investor Relations / Sales and Marketing Agreement" ("Investor Relations Agreement"), under which EMPO paid thousands of dollars per month to Contrarian Press, in part, to promote its business and stock. As a result, the promotional campaign fraudulently hid the fact that it was, in essence, sponsored by EMPO, the very company the promotional articles were recommending.

4.      In order to make this first promotional campaign more effective, Fraser and Contrarian Press worded the promotional articles to create the false appearance of objectivity in reporting on EMPO's prospects. For example, Fraser wrote a number of the promotional articles under an alias, "Charlie Buck." These promotional articles failed to disclose that Fraser was both EMPO's CEO and the promoter hiding behind the alias of "Charlie Buck", and drafted to create the false and misleading appearance that the author was an objective third-party, unconnected to EMPO and Fraser, who was strongly recommending the purchase of EMPO stock. For example, (a) when using the "Charlie Buck" alias as the author of articles, Fraser referred to EMPO's CEO (himself) in the third person; and (b) the articles explicitly disclaimed Contrarian Press's receipt

of payments from EMPO, despite the monthly payments made under the Investor Relations Agreement.

5.      As part of the second and third promotional campaigns—which ran in May 2012 and October through mid-November 2012, respectively—Fraser and Contrarian Press hired third parties, including Yeung, to arrange the promotion of EMPO and its stock in order to further obscure Contrarian Press's and Fraser's direction of the promotional campaigns. For example, from approximately summer through fall 2012, Yeung—working under the alias "Mason Zhang" and through a front company, "Crown Pacifica Media Services"—arranged a promotional campaign for EMPO's stock. Although Yeung worked at Fraser's direction and under his control, the promotional materials did not disclose Fraser's and Contrarian Press's involvement in the campaign and the fact that EMPO was paying Contrarian Press to promote its business and stock.

6.      As a result of Defendants' fraud, the investing public was misled both (a) as to the objectivity of the promotional material, specifically, that the promotional campaigns were arranged by EMPO's CEO; and (b) that EMPO paid for Contrarian Press to promote its stock.

7.      Defendants' efforts to promote EMPO's stock were successful. During each of the promotional campaigns, EMPO's stock volume and/or price increased substantially.

## VIOLATIONS

8.      By engaging in the conduct set forth in this Complaint:

   a.      Defendants Contrarian Press, Fraser, and Yeung violated Section 17(b) of

           the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(b)] and

           Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")

           [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-

3

5];

b.  Defendant Fraser aided and abetted Contrarian Press's violations of
Sections 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and Section
10(b) of the Securities Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-
5 thereunder [17 C.F.R. §§ 240.10b-5];

c.  Defendant Fraser was, at all relevant times, directly or indirectly, a control
person of Contrarian Press and therefore—under Section 20(a) of the
Exchange Act [15 U.S.C. § 78t(a)]—is jointly and severally liable with
and to the same extent as Contrarian Press for its violations of Section
10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5
thereunder [17 C.F.R. §§ 240.10b-5]; and

d.  Defendant Yeung aided and abetted Contrarian Press's and Fraser's
violations of Sections 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and
Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5
thereunder [17 C.F.R. §§ 240.10b-5].

## NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT

9.  The Commission brings this action pursuant to the authority conferred upon it by
Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the
Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

10.  The Commission seeks a final judgment: (a) restraining and permanently
enjoining Defendants from engaging in the acts, practices and courses of business alleged against
them herein and from committing future violations of the above provisions of the federal
securities laws; (b) ordering Defendants to disgorge any ill-gotten gains they received and to pay

prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) barring Defendant Fraser from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (e) barring Defendants Fraser and Yeung from participating in an offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (f) ordering such other and further relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 22(a), and 22(c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a), and 77v(c)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

12.    Venue lies in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York; for instance, investors who purchased during the relevant promotional campaigns were located in the Southern District of New York, EMPO's stock was at all relevant times quoted on the Manhattan–based OTC Bulletin Board, two of the stock promoters hired by Defendants to distribute promotional materials at issue in this case were based in Manhattan, and payments were made to at least one promoter through an account in New York City.

13.    In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants directly or indirectly have made use of the means and

instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

14.     **Scott S. Fraser**, age 52, is a resident of California and Nevada. At all relevant times, Fraser was EMPO's President, Chief Executive Officer, Chairman of the Board, and a major EMPO shareholder. Fraser was also the owner and President of Contrarian Press.

15.     **Nathan Yeung**, age 29, is a resident of Vancouver, Canada.

16.     **Contrarian Press, LLC**, is a limited liability company established under the laws of California. At all relevant times, Contrarian Press had offices in San Diego, California.

## RELATED ENTITY

17.     **Empowered Products, Inc.**, is a Nevada corporation with its principal offices in Las Vegas, Nevada. EMPO described itself as a manufacturer of gels and other "sexual health" products. EMPO had around fifteen full-time employees during 2011 and 2012.

## FACTS

**I.      Contrarian Press Background**

18.     Fraser founded Contrarian Press in approximately 1992 and at all relevant times owned and controlled the company. Contrarian Press's business was to publish newsletters and other information that promoted ideas for investing in securities, including making stock-picking recommendations.

19.     Fraser also founded, owned, and controlled other stock publishing companies, including Nat Con Publishing, Inc., Natural Contrarian, Inc., and EGA Research LLC.

20.     Contrarian Press published its investing newsletters under a number of titles, including "The Natural Contrarian," "Charlie Buck's Situational Strategies," "Stock-Profit

6

Guide," and "Contrarian Wealth Coalition."

21.     Contrarian Press and Fraser distributed the promotional materials through a variety of means, including by posting on websites controlled by Contrarian Press and Fraser and sending them by e-mail and direct mail.

22.     Fraser personally authored or authorized the content and distribution of Contrarian Press's newsletters and other publications.

## II.     **EMPO Background**

23.     Fraser founded EMPO in approximately 2002. At all relevant times, Fraser served as EMPO's President, Chief Executive Officer, and Chairman, and was a major shareholder.

24.     EMPO became a public company in approximately June 2011 by reverse merging with a public company called On Time Filings, Inc. ("On Time Filings"), which then changed its name to Empowered Products, Inc. Following the reverse merger, EMPO's stock was quoted on the OTC Bulletin Board and OTC Link under the ticker symbol "EMPO."

25.     On June 30, 2011, EMPO entered into a Subscription Agreement with New Kaiser Limited ("New Kaiser"), a Hong Kong-based entity. Under the agreement, EMPO sold New Kaiser 2 million EMPO shares in exchange for $1.5 million and the retirement of a promissory note for a $500,000 loan that New Kaiser had made to On Time Filings in May 2011. Leung Puen CPA Ltd. ("Leung Puen"), a Hong Kong-based entity, referencing New Kaiser, wired $500,000 to an account named "Empowered Products Capital Expenditures Account" ("EMPO Capital Account") on May 27, 2011, and $1.5 million to EMPO Capital Account on July 7, 2011. Before receiving these funds in May and July 2011, EMPO Capital Account and other On Time Filing Accounts had less than $100,000 in its bank accounts.

26.     Leung Puen received the $1.5 million it sent to EMPO Capital Account,

referencing New Kaiser, through a loan from Time Delight Limited, an entity controlled by Fraser's Hong Kong and Vancouver-based business associate ("Associate 1"). Associate 1 was a client of Leung Puen.

27.     Before the June 30, 2011 Subscription Agreement, including when EMPO was On Time Filings, Associate 1, directly and indirectly, owned EMPO shares. Associate 1 also funded a penny stock promotional campaign published by one of Fraser's stock publishing companies in 2010.

28.     On August 17, 2011, EMPO and Fraser's counsel directed EMPO's transfer agent to send New Kaiser's stock certificates to "Individual 1" in Hong Kong with a reference to New Kaiser. Individual 1 is a member of Leung Puen's management team and is a Hong Kong-based business associate of Associate 1. Individual 1 is also the beneficial owner of Ocean Faith Limited, the entity from which Leung Puen received the $500,000 it sent to EMPO Capital Account, referencing New Kaiser, in May 2011. In addition, Ocean Faith Limited sent hundreds of thousands of dollars to Associate 1's personal bank accounts in May 2011.

## III.   **The Investor Relations Agreement**

29.     On July 1, 2011—immediately after EMPO became a public company—Fraser caused EMPO and Contrarian Press to enter into the Investor Relations Agreement. Fraser signed the agreement on behalf of EMPO and directed a Contrarian Press employee to sign for Contrarian Press.

30.     Under the Investor Relations Agreement, Contrarian Press served as a consultant to EMPO, with the aim of, among other things, helping EMPO to attract new shareholders. To that end, the agreement set out Contrarian Press's "objectives" as being:

> [T]o establish, maintain, and expand the shareholder bases of its clients, and create wholesale and retail consumer awareness for the

8

purpose of increasing product sales. Contrarian Press's complete service package is designed to provide a continuous stream of communication to the investing public and retail consumer with response mechanisms that expand the active interest of new and current shareholders and consumers. The ultimate goal of this agreement between Contrarian Press and its clients is to attain the highest shareholder and consumer loyalty through consistent quality-controlled information services.

31.     Under the terms of the Investor Relations Agreement, EMPO initially paid Contrarian Press $14,500 per month. This amount increased over time, eventually reaching at least $19,500 per month. From 2011 through 2014, EMPO paid Contrarian Press approximately $1 million pursuant to the Investor Relations Agreement. These payments were significant to EMPO, which reported net losses in each of 2011, 2012, and 2014, and net income of only $134,000 in 2013.

## IV.   The First Promotional Campaign: Contrarian Touts EMPO's Stock

32.     Shortly after entering into the Investor Relations Agreement—and true to its agreement to attempt to expand EMPO's shareholder base—Contrarian Press began touting EMPO's stock in promotional newsletters. However, in order to create the false and misleading appearance of objectivity, the Contrarian Press promotional materials, as drafted by Fraser, masqueraded as objective and independent stock picking newsletters, with no disclosure of Fraser's involvement with Contrarian Press, or that Fraser was, in fact, "Charlie Buck," the supposedly independent stock analyst-author of Contrarian Press newsletters that so highly touted the prospects of EMPO.

33.     For example, on September 9, 2011, Contrarian Press issued a newsletter called the "Stock-Profit Guide," which stated that "Empowered Products (EMPO) represents a solid growth stock that just launched at $1.25 per share." This newsletter purported to be written by "Charlie Buck." "Charlie Buck" was a pseudonym for Fraser, who was the true author of the

Stock Profit Guide. In authoring the Stock Profit Guide, Fraser took additional steps to create the

appearance that neither he nor EMPO were involved in its preparation. For example, Fraser

phrased the newsletter as an objective evaluation of EMPO, for example by discussing himself in

the third person, to create the false impression that Charlie Buck was an objective third party:

> What I am impressed with most at this early stage is the company's
> global sales reach and expanding revenue/growth model. I also
> love that Empowered Products is a U.S. corporation operating in
> America, employing American workers, and manufacturing its
> production on U.S. soil . . . . According to the company,
> Empowered has obtained over 85 trademarks for its products
> worldwide. And, over the last five operational years, EMPO has
> reported a steady increase in the operational capacity/efficiency of
> its Las Vegas, Nevada, bottling facility . . . .
>
> I have known the founder, president, and CEO of Empowered
> Products, Scott Fraser, for many years and I've watched the
> company grow from a small, private entity nine years ago to a
> rapidly emerging publicly traded corporation today.

34.     The Stock Profit Guide was an exhortation to buy EMPO's stock. In it Fraser

styled the information about EMPO as "Preemptive Profit-Positioning" and invited readers to

invest:

> Keep in mind also that Empowered Products just launched onto the
> Over-the-Counter Bulletin Board exchange in July 2011 under the
> symbol EMPO, which mean you have an opportunity to own
> shares in an established wellness company that just commenced
> public trading.
>
> Empowered Products, in my opinion, has every indicator of being
> able to successfully transition to a senior stock exchange such as
> the NYSE-Amex or Nasdaq within the near-term. For those
> interested in a wellness company with nearly a decade of
> successful operations that's also a brand new growth stock, I
> believe Empowered Products (EMPO) has all the pieces in-place to
> merit a buy recommendation at this early stage.

35.     The newsletter went on to say that the "author . . . does not accept compensation

from publicly traded companies in return for his commentary," without disclosing that the actual

author was Fraser, who was both the CEO of EMPO and the owner of Contrarian Press, which was, in fact, well compensated by EMPO for its promotion of the company.

36.     All of these statements were materially false and misleading. In effect, EMPO was promoting itself, without disclosing that it was doing so.

37.     Throughout September and October 2011, Contrarian Press issued additional Stock-Profit Guides promoting EMPO as a good investment. For example, Fraser wrote:

- "Empowered Products (EMPO) represents a solid growth stock";

- "Start buying EMPO . . . now at $1.25 per share with a buy-ceiling set at $1.35";

- "EMPO shareholders who buy now up to $1.35 own a proven growth model";

- "Buy shares in this emerging global wellness company today"; and

- "EMPO shares remain within our buy-range at the current $1.25 level".

38.     Fraser authored each of these newsletters. However, as with the September 9, 2011 newsletter, Fraser presented the Stock-Profit Guides as objective analysis of EMPO and its prospects, and he concealed that he was the moving force behind the promotions.

39.     In these subsequent newsletters, Fraser again spoke about "Scott Fraser" in the third person, creating the impression that the newsletters were written by an objective third party. Thus, on both September 16 and 21, 2011, Fraser and Contrarian Press issued newsletters purporting to describe an "interview with [EMPO's] CEO, Scott Fraser" and stating that they had "known the founder, president, and CEO of Empowered Products, Scott Fraser, for many years."

40.     In addition, each of these newsletters disclaimed Contrarian Press's connection to EMPO, stating that it "did not accept compensation in return for this commentary." This statement was materially false and misleading because it concealed that EMPO, working through Fraser, had approved and paid for these materials to be published and further created the

11

misleading appearance that the newsletters were objective analysis of EMPO's prospects.

41.     Fraser—who obviously understood his dual roles at Contrarian Press and EMPO and knew about the Investor Relations Agreement—knew (or recklessly disregarded) that these newsletters were materially false and misleading.

42.     Fraser and Contrarian Press distributed the Contrarian Press newsletters to subscribers by e-mail and/or direct mail.

43.     EMPO's shares began trading on or about July 19, 2011. Between July 19, 2011 and September 5, 2011, EMPO's stock traded between $1.00 and $1.25 per share, with an average daily trading volume of approximately 365 shares per day. From September 9, 2011 through October 12, 2011—while Fraser and Contrarian Press were issuing their false and misleading newsletters—the average daily trading volume increased to approximately 1,263 shares per day (a 240% increase).

## V.     The Second Promotional Campaign: May 2012

44.     Beginning in April 2012, Fraser and Contrarian Press began arranging another campaign to promote EMPO stock while EMPO continued to make monthly payments to Contrarian Press for investor relations activities. This campaign occurred in May 2012. This time, however, they took efforts to hide both Fraser's and Contrarian Press's involvement in the campaign.

45.     Fraser arranged for his long-time associate ("Associate 2") to organize the promotional campaign through his companies, Red Rock Marketing Group LLC ("Red Rock") and Silver Crest Equity Research LLC ("Silver Crest Equity Research"). By May 2012, when the promotional material touting EMPO was released, Associate 2 and Red Rock had a longstanding relationship with Fraser and Contrarian Press. Red Rock was a print-broker, which coordinated

printing jobs, renting e-mail lists for stock promotions, and distributing printed materials by direct mail and e-mail. Fraser and Contrarian Press represented virtually all of Red Rock's and Associate 2's business, and Red Rock and Associate 2 arranged for the printing and distribution of stock promotions for Fraser and Contrarian Press.

46.     In addition, Associate 2 and Red Rock did work for EMPO. For example, from January through early May, 2012, EMPO paid Red Rock approximately $37,000 for various jobs. Moreover, in 2012, Fraser referred to Associate 2 as an EMPO employee and provided Associate 2 with an EMPO e-mail address, at which Fraser corresponded with him. In January 2012, Fraser sent an email to all EMPO employees noting that he appointed Associate 2 as EMPO's "vice president of sales and business development."

47.     Associate 2 also owned Silver Crest Equity Research, which published a stock investment newsletter called the "Investor Stock Advisory." Associate 2 attributed the articles in the Investor Stock Adviser to a pseudonym, "George Hughes." However, Associate 2 was responsible for hiring copy writers and approving the substance and distribution of the newsletter.

48.     In April 2012, Associate 2 paid another associate of Fraser's—who was also a regular contributor to Contrarian Press's own promotional articles—$2,500 to write the copy for an Investor Stock Advisory promotional newsletter about EMPO.

49.     Fraser saw and approved the Investor Stock Advisory newsletter about EMPO before it was distributed to the investing public. Associate 2 hired a number of stock promoters to distribute the EMPO newsletters to their subscribers by e-mail. In order to ensure that the e-mail distribution went smoothly, those promoters undertook a test distribution to a small group of e-mail addresses provided to them by Red Rock, which included Associate 2 and Fraser.

13

Therefore, Fraser knew (or recklessly) disregarded that Investor Stock Advisory was issuing a promotional newsletter about EMPO before it was distributed to prospective investors.

50.    Associate 1 funded the May 2012 promotion. In April 2012, Yaksha Industries, Inc. ("Yaksha"), a Nevis entity, wired $330,000 to Mass Media Advertising Ltd. ("Mass Media"), a Hong Kong entity, with a memo reading "EMPO." Yaksha Trust is the beneficial owner of Yaksha. Associate 1, who is based in Hong Kong and Vancouver, is the beneficiary of Yaksha Trust, according to account opening documents at a Swiss bank. Associate 1 uses two distinct names, both of which were listed on the account opening documents.

51.    Later in April 2012, Mass Media wired approximately $326,000 to Associate 2's entity—Silver Crest Equity Research—with a memo reading "RE FEES FOR PROJECT."

52.    Mass Media is closely connected to Fraser. During the period from 2007 to 2011, Mass Media paid nearly nine million dollars to three Fraser-controlled entities—Nat Con Publishing LLC, Natural Contrarian LLC, and EGA Research LLC—for penny stock promotional campaigns unrelated to EMPO. In addition, an individual who worked for EMPO at the time of the May 2012 and October-November 2012 promotions and ultimately reported to Fraser ("Associate 3") is an authorized signatory on Mass Media's Hong Kong-based bank account. Associate 3 is also an authorized signatory on one of EMPO's bank accounts. At the time of the May 2012 promotion, Fraser either knew or was reckless in not knowing about Associate 3's connection to Mass Media.

53.    In May 2012, Silver Crest Equity sent a check for $306,000 to Red Rock.

54.    On various dates in April and May 2012, Red Rock sent payments totaling approximately $255,000 to various third-party stock promoters and consultants it hired to create and distribute the promotion.

55.     The following illustrates the payment flow for the May 2012 promotion:



56.     From approximately May 1 through May 23, 2012, Red Rock distributed Investor Stock Advisory newsletters touting EMPO's stock—through the third-party stock promoters Red Rock hired—to at least hundreds of thousands of potential investors. The Investor Stock Advisory newsletters repeatedly urged the purchase of EMPO stock, stating for example:

- EMPO's "$1 Stock Can Only Go UP!";

- "EMPO at around $1.00 could catapult above $15.00 by this time next year . . . ";

- "So, how do you make money on EMPO today?  It's simple.  You buy the

15

stock right now around $1 and then sell part of your position during the first projected run to above $3. Then, hold onto the remainder of your EMPO shares and watch your net worth multiple . . . ."; and

- "I'm issuing an immediate STRONG BUY for Empowered Products (EMPO) . . . Get in now and $5,000 could quickly grow to $25,000+."

57.     The Investor Stock Advisory newsletters contained a disclaimer that:

This stock profile is paid advertisement. In order to enhance public awareness of Empowered Products (EMPO) and its securities through the distribution of this report, Mass Media Advertising paid the publisher, Silver Crest Equity Research, the sum of $326,700 . . . All trademarks used in this publication are the property of their respective trademark holders. Silver Crest Equity Research is not affiliated, connected, or associated with, and are not sponsored, approved, or originated by, the trademark holders unless otherwise stated.

58.     This statement was, at a minimum, materially misleading because it created the false impression that Silver Crest Equity Research was an independent firm, while not disclosing that Associate 2 was EMPO's vice president of sales and marketing at the time of this promotion and that almost all of his business was derived from Fraser, Contrarian Press, and EMPO. Nor did it disclose that Fraser (and, therefore, EMPO) had arranged for the promotion, the connection between Mass Media and EMPO through Associate 3 (who worked for Fraser), that Fraser had reviewed and approved the promotional materials before they were distributed, or that EMPO had paid Red Rock Marketing approximately $10,000 in May 2012.

59.     During the promotions—from approximately May 1 through May 23, 2012— EMPO's trading volume increased from an average of 2,909 shares per day in April 2012 to 45,866 shares per day (approximately a 1,400% increase).

## VI.     The Third Promotional Campaign: October-November 2012

### A.     Contrarian Press and Fraser Hire Yeung to Promote EMPO's Stock.

60.     In approximately summer 2012, Fraser and Contrarian Press hired Yeung to

undertake another surreptitious promotion of EMPO's stock (among other tasks).

61.     Associate 1 introduced Yeung to Fraser. Yeung had previously met Associate 1 through a family friend.

62.     On August 21, 2012, Yeung invoiced Contrarian Press approximately $30,000 for his upcoming work for "Media Management Services." Contrarian Press paid Yeung later in August 2012.

63.     To hide his true identity, Yeung arranged for the EMPO promotional campaign under the pseudonym "Mason Zhang". On August 21, 2012, Yeung asked Contrarian Press's IT specialist ("Contrarian Press IT Specialist") to provide him with an e-mail address— "mz@contrarianpress.com"—that corresponded to that pseudonym. That same day Contrarian Press's IT specialist set up that e-mail address for Yeung and copied Fraser on the e-mail correspondence.

64.     Also on August 21, 2012, Yeung created a Skype account in the name of "Mason Zhang", allowing him to have a phone number associated with the pseudonym.

65.     On August 22, 2012, Fraser used the email address mobil@egaresearch.com to email Yeung, Contrarian Press IT Specialist, his personal assistant ("Personal Assistant"), and others concerning Contrarian Press's "new project."

66.     Fraser and Contrarian Press hired Contrarian Press IT Specialist.

67.     Between 2008 and the institution of this litigation, Personal Assistant was an employee of Contrarian Press and reported to Fraser.

**B.      Yeung Organizes the EMPO Promotion on Behalf of Contrarian Press.**

68.     From August 22 (the day after he was given a Contrarian Press e-mail address) through approximately September 2012, Yeung hired stock promoters to distribute the

promotional materials about EMPO by e-mail to their subscribers. Yeung did not tell these promoters his real name, but instead held himself out as "Mason Zhang" "VP of Marketing" at Contrarian Press. Yeung communicated with these promoters through his "mz" Contrarian Press e-mail address.

69.     Yeung made no effort to hide from his Contrarian Press colleagues that he was communicating with stock promoters to organize a promotional campaign or that, in doing so, he was holding himself out as a Contrarian Press employee named Mason Zhang. For example, Yeung copied colleagues at Contrarian Press on e-mails—using the Contrarian Press e-mail address associated with Mason Zhang—in which he referred to himself as Mason Zhang.

70.     Moreover, Yeung and Associate 1 met with Fraser in Las Vegas in October 2012, during the third EMPO promotional campaign. During that trip, Yeung toured EMPO's factory; Yeung, Fraser, and Associate 1 had dinner; and Yeung met with a stock promoter that he had hired for the EMPO campaign.

71.     Yeung and Associate 1 also met in Chicago in October 2012 to discuss the third EMPO promotion with another stock promoter.

**C.     Crown Pacifica Media Services**

72.     Yeung initially instructed the stock promoters to direct their invoices to Contrarian Press, which many of them did.

73.     However, in order to further obscure Contrarian Press's—and therefore Fraser's and EMPO's—involvement with the latest EMPO promotional campaign, Fraser had Personal Assistant create a new company, Crown Pacifica Media Services, Inc. ("Crown Pacifica") in early October 2012. Crown Pacifica's sole purpose was to create the appearance that an entity other than Contrarian Press was organizing the EMPO promotion. To that end, Crown Pacifica's

18

only business was to receive funds and to transfer those funds, as payment, to the stock
promoters that Yeung had already hired.

74.     To further obfuscate Contrarian Press's role in organizing the promotional
campaign, in approximately late September, Yeung switched e-mail addresses from
"mz@contrarianpress.com" to a Gmail address still under the pseudonym "Mason Zhang."

75.     In October 2012, once Crown Pacifica was established, Yeung and the Personal
Assistant asked the stock promoters to re-issue their invoices—initially addressed to Contrarian
Press—to Crown Pacifica. In recognition of the fact that Crown Pacifica was nothing more than
a straw man meant to hide Contrarian Press's and Fraser's involvement in the campaign, Yeung
sent an e-mail to one promoter telling him "I'll be modifying the insertion orders you sent to me
BTW; there are some errors in it [sic] via contact information and what should be on paper."

76.     Fraser was aware of (or recklessly disregarded) Crown Pacifica's role in the
October-November 2012 promotion. On September 21, 2012, Fraser used the email address
mobil@egaresearch.com to email Associate 1, at an email address indicating one of Associate
1's two names. In this email, Fraser sent Associate 1 Crown Pacifica's bank wiring instructions,
including its routing and account numbers. The same day, Associate 1 forwarded the wiring
instructions that Fraser provided to another associate with instructions to wire $185,000 from
Alpine View SA ("Alpine View") to Crown Pacifica.

77.     On September 25, 2012, Crown Pacifica received approximately $185,000 from
Alpine View. The wire instructions stated "Payment of 185000 to Crown Pacifica IR for
EMPO." On October 2, 2012, Crown Pacifica received approximately $312,000 from Alpine
View. The wire instructions stated "Payment of 312800 USD to Crown Pacifica Invoice
attached, IR for EMPO." On November 1, 2012, Crown Pacifica received approximately

19

$89,000 from Alpine View. The wire instructions stated "Payment of 89000 USD to Crown Pacifica Media Services Inc. invoice for IR on EMPO." In sum, Alpine View paid more than $586,000 for the October through November promotions.

78.     Alpine View received a portion of these funds from Axe Group AG ("Axe Group"). Axe Group is beneficially owned by Associate 1. In July 2011, Axe Group purchased over two million EMPO shares. Axe Group used proceeds from the sale of EMPO stock to fund Alpine View. Axe Group sold around 64,000 EMPO shares during the May 2012 EMPO promotional campaign for net proceeds of approximately $79,000. Then, in the very next transaction in its account, Axe Group wired approximately $70,000 to Alpine View.

79.     Also, on September 28, 2012, Personal Assistant emailed Associate 1, at the same email address that Fraser used on September 21, 2012 to transmit Crown Pacifica's bank wiring instructions to Associate 1. Personal Assistant's email to Associate 1 attached purchase orders she had sent to third-party stock promoters and  apprised him that Crown Pacifica had wired funds to those promoters to promote EMPO during the week of October 8-12, 2012.

**D.      The Third Promotional Campaign Operation**

80.     On August 29, 2012, Yeung asked two Contrarian Press employees to provide him with an example of a past promotional campaign for EMPO that he could use as a model in creating the new promotional materials. Later that day, and in response to Yeung's request, Fraser sent Yeung an e-mail containing copies of Red Rock's May 2012 EMPO promotional materials to use as model.

81.     For the October-November 2012 promotion, Contrarian Press IT Specialist registered an internet domain name at "www.growthstockscreener.com." According to a December 2012 invoice that Contrarian Press IT Specialist sent to Alpine View for $1,667,

20

Contrarian Press IT Specialist also performed the following work for "EMPO Report Sep

2012?": "Landing Page + signup form," "Domain name registration for one year + private

registration: growthstockscreener.com," SHORT hosting package Sept-Dec 2012," "Teaser +

Template," "Logo," "Change the signup form to external," "Final tests and adjustments," Teaser

2 – October 15, 2012," "Landing page 2 – Oct 15, 2012," "Thank You page," and "Landing page

and teaser 3 – October 25, 2012."

      82.     Yeung then sent the stock promoters he had hired promotional materials that he

and others at Contrarian Press had created, one of which purported to be a newsletter from an

entity called "Aggressive Growth-Stock Screener." Yeung directed stock promoters to

www.growthstockscreener.com to download or access EMPO promotional material. Yeung also

provided the third-party promoters with the subject lines for the e-mails they would send to their

subscribers. These promotional materials, including the "Aggressive Growth-Stock Screener,"

exhorted the reader to purchase EMPO stock. For example, "Aggressive Growth-Stock

Screener" was titled

EMPO: Empowered Products<br>
Current EMPO around $1 with expanding value about $15<br>
Now is Your Chance to Buy Huge Asset-Growth Beforehand

      83.     Those promotional materials contained disclaimers, which failed to accurately

disclose EMPO's, Contrarian Press's, or Fraser's involvement in (and approval of) the

promotional campaign and materials, or EMPO's involvement in paying Contrarian Press to

undertake promotional campaigns. For example, the Aggressive Growth-Stock Screener

newsletter contained a disclaimer:

> Alpine View Media is providing a budget of $750,000 and this
> report to Crown Pacifica to coordinate the distribution of this
> featured report on Empowered Products Inc. . . . Empowered
> Products Inc. has neither approved nor paid for this specific
> advertisement.

21

84.     Yeung understood (or recklessly disregarded) that (a) he was undertaking the promotion for Contrarian Press and Fraser and (b) Fraser ran both Contrarian Press and EMPO. Therefore, Yeung knew (or recklessly disregarded) this disclaimer was false because it disclaimed Contrarian Press's, Fraser's, and EMPO's approval of and involvement in the promotional campaign. Moreover, as discussed above, Fraser knew (or recklessly) disregarded that the newsletter and the promotional campaign in general were deceptive because (a) Fraser had hired Yeung to undertake the promotional campaign; (b) Fraser understood (or recklessly disregarded) that Yeung was using a pseudonym; (c) Fraser had supplied Yeung with a model for the promotional newsletters; and (d) Fraser understood (or recklessly disregarded) that Crown Pacifica was merely a straw man to hide Contrarian Press's management of the promotional campaign.

85.     From approximately early October to mid-November 2012, the stock promoters that Yeung hired sent e-mails to over 3 million prospective investors. None of these e-mails— some of which contained links to the Aggressive Growth-Stock Screener newsletter that included the misleading disclaimer set out above—accurately disclosed the involvement of EMPO (via Fraser), Contrarian Press, or Fraser in arranging the promotional campaign.

86.     Purchase Orders that Crown Pacifica and Yeung sent to the third-party stock promoters, which indicated payment dates and amounts paid to the promoters for work on the October-November 2012 promotion, also referred to "Aggressive Growth-Stock Screener." The purchase orders stated "Our list rental coordination services are rendered to the Aggressive Growth-Stock Screener (AGSS) within a fee-based agreement only in support of the AGSS feature report on [EMPO.]" The purchase orders claimed that "Crown Pacifica Media Services does not own shares or benefits in the trading of EMPO shares."

87.     Prior to this promotion, from September 4 to October 5, 2012, EMPO's stock price traded between $0.70 and $0.95 with an average daily trading volume of 681 shares per day. During this promotional campaign, the price of EMPO shares increased to a high of $1.11 per share, with an average daily trading volume of 70,185 shares per day. After the promotional campaign ended, the price of EMPO's stock and average daily trading volume collapsed. By November 30, 2012, EMPO's stock closed at $0.32 per share, with an average daily trading volume from November 15 to November 30, 2012 of 18,895 shares per day.

88.     In addition, further demonstrating Crown Pacifica's role as straw man for Contrarian Press, in approximately November 2012, the Personal Assistant reimbursed herself approximately $4,000 from Contrarian Press's bank account for money she had personally advanced Crown Pacifica to cover promotional expenses for the campaign.

89.     Following the promotion, Crown Pacifica never had any other business. Crown Pacifica did not receive any compensation for this campaign.

90.     On December 6, 2012, Alpine View paid Contrarian Press IT Specialist $1700 with a memo reading "Payment of 1700 USD to [Contrarian Press IT Specialist] IR on EMPO."

## VII.     Additional EMPO Promotions

91.     Fraser subsequently authored and posted to one of Contrarian Press's websites additional newsletters recommending EMPO's business and stock. These newsletters were likewise falsely presented as objective articles concerning the company and its prospects.

92.     On October 26 and November 21, 2012, Fraser authored and posted to Contrarian Press's website articles about EMPO under the pseudonym "Charlie Buck." In these articles Fraser recommended investing in EMPO. For example, he wrote:

> Last week, I mentioned we'd be bringing you a pure-play micro-cap stock . . . and here it is:  Empowered Products . . . .  The stock

23

is currently trading around a buck, and we see the company as
well-positioned in a newly-emerging stock sector.

93.     Neither of these articles contained any disclaimer as to Fraser's authorship, his

ownership of EMPO, or that EMPO was continuing to make monthly payments to Contrarian

Press under the Investors Relations Agreement.

94.     Moreover, Contrarian Press's website to which Fraser posted these articles

contained a general disclaimer stating: "The publisher is not, and does not purport to be, a

registered investment adviser and did not accept compensation in return for this commentary."

95.     This statement was false and misleading because, as Fraser and Contrarian Press

knew (or recklessly disregarded), it did not disclose (a) that Charlie Buck was a pseudonym for

Fraser; (b) that Fraser had authored the newsletters and was an officer of EMPO; or (c) that

EMPO was paying Contrarian Press under the Investor Relations Agreement.

**FIRST CLAIM FOR RELIEF**
**(Against Defendants Contrarian Press, Fraser, and Yeung)**
**Violations of Section 17(b) of the Securities Act**

96.     The Commission re-alleges and incorporates by reference herein each and every

allegation in paragraphs 1 through 73.

97.     By engaging in the conduct described above, Defendants Contrarian Press, Fraser,

and Yeung, by the use of means or instruments of transportation or communication in interstate

commerce or by the use of the mails, published, gave publicity to, or circulated notices, circulars,

advertisements, newspapers, articles, letters, investment services, or communications which,

though not purporting to offer securities for sale, described such securities for a consideration

received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without

fully disclosing the receipt, past or prospective, of such consideration and the amount thereof.

98.     By engaging in the foregoing conduct, Defendants Contrarian Press, Fraser, and

24

Yeung violated and, unless restrained and enjoined, will continue violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## SECOND CLAIM FOR RELIEF
### (Against Defendants Contrarian Press, Fraser, and Yeung)
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

99.     The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 73.

100.    By engaging in the conduct described above, Defendants Contrarian Press, Fraser, and Yeung knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

      a.     employed devices, schemes, or artifices to defraud;

      b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

101.    By engaging in the foregoing conduct, Defendants Contrarian Press, Fraser, and Yeung violated and, unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF
### (Against Defendants Fraser and Yeung)
### Aiding and Abetting Violations of Section 17(b) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

102.    The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 73.

103.    By engaging in the conduct described above and pursuant to Section 15(b) of the

Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)],

Defendants Fraser and Yeung, singly or in concert, directly or indirectly, aided and abetted, and

are therefore also liable for Defendant Contrarian Press's (and, in Yeung's case, Defendant

Fraser's) primary violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5], because they knowingly or recklessly provided substantial assistance to Defendant

Contrarian Press's (and, in Yeung's case, Defendant Fraser's) violations of Section 17(b) of the

Securities Act [15 U.S.C. § 77q(b)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

104.    Unless restrained and enjoined, Defendants Fraser and Yeung will again aid and

abet violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and Section 10(b) of

the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF
### (Against Defendant Fraser)
### Violations of Section 20(a) of the Exchange Act

105.    The Commission re-alleges and incorporates by reference herein each and every

allegation in paragraphs 1 through 73.

106.    At all relevant times, Fraser has been, directly or indirectly, a control person of

Defendant Contrarian Press for purposes of Section 20(a) of the Exchange Act [15 U.S.C. §

78t(a).]

107.    Defendant Fraser, as a control person of Defendant Contrarian Press, is jointly

and severally liable with and to the same extent as Defendant Contrarian Press for its violations

of Section 10(b) of the Exchange Act [15U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

(a)        finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

(b)        permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert who receive actual notice of the injunction, and each of them from, directly or indirectly, violating or aiding and abetting violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(c)        directing Defendants to disgorge all ill-gotten gains plus pre-judgment interest thereon;

(d)        directing Defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(e)        permanently barring Defendant Fraser from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

(f)        permanently prohibit Defendants Fraser and Yeung from participating in the offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

(g)    granting such other and further relief as this Court may deem just and proper.

Dated:        January 22, 2018
              New York, New York

                        SECURITIES AND EXCHANGE COMMISSION

                        Lara Shalov Mehraban
                        Associate Regional Director
                        Sandeep Satwalekar
                        Haimavathi V. Marlier
                        Tejal D. Shah
                        Attorneys for Plaintiff
                        SECURITIES AND EXCHANGE COMMISSION
                        New York Regional Office
                        200 Vesey Street, Suite 400
                        New York, New York 10281-1022
                        (212) 336-1055 (Marlier)
                        Email:  MarlierH@sec.gov