UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

                    -against-

CONTRARIAN PRESS, LLC, SCOTT S.
FRASER, and NATHAN YEUNG,

                              Defendants.

--------------------------------------------------------

Case No. 16 Civ 06964

**ECF CASE**

**ORAL ARGUMENT REQUESTED**

**<u>MEMORANDUM OF LAW IN SUPPORT OF SCOTT FRASER'S
AND CONTRARIAN PRESS' MOTION TO DISMISS AMENDED
COMPLAINT WITH PREJUDICE</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

SUMMARY OF PLAINTIFF'S ALLEGATIONS .............................................. 3

THE NEW ALLEGATIONS IN THE AMENDED COMPLAINT FURTHER
    ACCENTUATE ITS DEFICIENCIES ......................................................... 9

STANDARD OF REVIEW ................................................................................ 11

ARGUMENT ..................................................................................................... 12

I.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM AS TO THE
     2012 PROMOTIONS ................................................................................ 12

     A.    Section 10(b) and Rule 10b-5 ......................................................... 12

          1.    The Amended Complaint Does Not Allege That Mr. Fraser or
               Contrarian Press Made Any Statements or Engaged in Any
               Deceptive Acts ..................................................................... 13

          2.    The Amended Complaint Does Not Allege Facts Creating a Strong
               Inference of Scienter ........................................................... 16

               a.    The Amended Complaint Fails to Allege That Mr. Fraser or
                    Contrarian Press Had Any Motive ............................... 16

               b.    The Amended Complaint Fails to Allege Any Conscious
                    Misbehavior or Recklessness ....................................... 18

     B.    The Amended Complaint Does Not State a Section 17(b) Claim for the
          May 2012 and October 2012 Promotions ...................................... 20

     C.    Claims for Aiding and Abetting Violations of Sections 10(b) and 17(b)
          Fail .................................................................................................. 21

          1.    The Amended Complaint Fails to Adequately Allege a Primary
               Violation of Exchange Act Sections 10(b) or 17(b) or Mr. Fraser's
               Knowledge or Reckless Disregard of Same............................ 22

          2.    The Amended Complaint Fails to Adequately Allege Mr. Fraser
                Provided Substantial Assistance ............................................ 22

II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM AS TO THE
     CONTRARIAN PRESS PUBLICATIONS.................................................. 24

     A.    Section 10(b) and Rule 10b-5 ......................................................... 24

          1.    The Amended Complaint Fails to Allege a Material
               Misrepresentation or Materially Misleading Omission ......... 24

          2.    The Amended Complaint Fails to Allege Facts Creating a Strong
               Inference of Scienter in Relation to the Contrarian Press
               Publications........................................................................... 26

## TABLE OF CONTENTS
(continued)

**Page**

a.     The Amended Complaint Fails to Allege That Mr. Fraser Had Any Motive ......................................................................... 26

b.     The Amended Complaint Fails to Allege Any Conscious Misbehavior or Recklessness on the Part of Mr. Fraser or Contrarian Press ........................................................................ 27

B.     The Amended Complaint Does Not State a Section 17(b) Claim Against Mr. Fraser for the Contrarian Press Publications .................................... 28

III.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM AS TO THE ADDITIONAL EMPO PROMOTIONS .......................................................... 28

IV.     MR. FRASER CANNOT BE LIABLE UNDER EXCHANGE ACT SECTION 20(A) BECAUSE CONTRARIAN PRESS IS NOT LIABLE ........................................ 29

THE COURT SHOULD GRANT NO FURTHER LEAVE TO AMEND ................................ 29

CONCLUSION ..................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005)...................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................11

*Bd. Of Trs. Of Ft. Lauderdale Gen. Emples Ret. Sys. v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011)...................................................................29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................11

*Central Bank of Denver v. First Interstate Bank of Denver*,
  511 U.S. 164 (1994)............................................................................................13, 14

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)..............................................................................18, 27

*Decker v. Massey-Ferguson, Ltd.*,
  681 F.2d 111 (2d Cir. 1982)..................................................................................18

*In re DNTW Chtd. Accountants Sec. Litig.*,
  96 F. Supp. 3d 155 (S.D.N.Y. 2015)...................................................................29

*Hart v. Internet Wire, Inc.*,
  145 F. Supp. 2d 360 (S.D.N.Y. 2001)..................................................................18

*Janus Capital Group v. First Derivative Traders*,
  131 S. Ct. 2296 (2011)........................................................................10, 13, 14, 15

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013)..................................................................................29

*Kokesh v. SEC*,
  137 S. Ct. 1635,1640 (2017)..................................................................................17

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)..................................................................................11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..........................................................................16, 18, 26

*Provda v. Farkas*,
   1994 WL 542267 (S.D.N.Y. Oct. 5, 1994) ........................................................................12

*In re Psychemedics Corp. Secs. Litig.*,
   No. 17-10186, 2017 U.S. Dist. LEXIS 183955 (D. Mass. Nov. 17, 2017) ...........................23

*United States ex rel. Ramos v. Icahn Sch. of Med.*,
   2015 WL 5472933 (S.D.N.Y. Sept. 16, 2015) .....................................................................11

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).................................................................................................11

*SEC v. Apuzzo*,
   689 F.3d 204 (2d Cir. 2012)............................................................................................21, 22

*SEC v. China Northeast Petroleum Holdings Ltd*,
   27 F. Supp. 3d 379 (S.D.N.Y. 2014).....................................................................................16

*SEC v. Collins & Aikman Corp.*,
   524 F. Supp. 2d 477 (S.D.N.Y. 2007)...................................................................................11

*SEC v. DiBella*,
   587 F.3d 553 (2d Cir. 2009)..................................................................................................22

*SEC v. Gorsek*,
   222 F. Supp. 2d 1099 (C.D. Ill. 2001) ......................................................................20, 21, 28

*SEC v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................................................15

*SEC v. KPMG LLP*,
   412 F. Supp. 2d 349 (S.D.N.Y. 2006)...................................................................................15

*SEC v. Monarch Funding Corp.*,
   192 F.3d 295 (2d Cir. 1999)............................................................................................12, 24

*SEC v. Parnes*,
   No. 01-0763, 2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) .................................................30

*SEC v. Tambone*,
   417 F. Supp. 2d 127 (D. Mass. 2006) ...................................................................................30

*SEC v. Thompson*,
   238 F. Supp. 3d 575 (S.D.N.Y. 2017)...................................................................................21

*SEC v. Treadway*,
   430 F. Supp. 2d 293 (S.D.N.Y. 2006)...................................................................................16

*SEC v. Wey,*
   246 F. Supp. 3d 894 (S.D.N.Y. 2017)...........................................................................*passim*

*Tull v. U.S.,*
   481 U.S. 412 (1987)...........................................................................................................17

*U.S. v. Parkinson,*
   240 F.2d 918 (9th Cir. 1956) ............................................................................................17

*U.S. v. Wenger,*
   427 F.3d 840 (10th Cir. 2005) ..........................................................................................21

*United States v. Martoma,*
   993 F. Supp. 2d 452 (S.D.N.Y. 2014)..........................................................................26, 29

## Statutes

15 U.S.C. § 77q(b) ....................................................................................................................20

15 U.S.C. § 78t(a) .....................................................................................................................29

28 U.S.C. § 2462's 5-year..........................................................................................................17

Exchange Act Rule 10b-5 .................................................................................................*passim*

Exchange Act Section 10(b) .............................................................................................*passim*

Exchange Act Section 20 ............................................................................................................29

Exchange Act Section 20(a)........................................................................................................29

Securities Act Section 17(b) ...............................................................................20, 21, 24, 28

## Other Authorities

17 C.F.R. § 240.10b-5................................................................................................................15

Fed. R. Civ. P. 9(b)..............................................................................................11, 16, 30

Fed. R. Civ. P. 12(b)(6)...........................................................................................11, 25

Defendants Contrarian Press, LLC ("Contrarian Press") and Scott S. Fraser ("Mr. Fraser") (collectively, "Defendants") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss.

## **INTRODUCTION**

After considering Defendants' motions to dismiss its original complaint (*see* Doc. Nos. 55-60), the United States Securities and Exchange Commission ("Plaintiff" or "SEC") implicitly acknowledged they were meritorious by electing to file the Amended Complaint instead of opposing them. Curiously, most of the new allegations the SEC has added do not involve any of the Defendants, but rather relate to the conduct of third parties in connection with stock promotional campaigns. This further highlights the deficiencies in the SEC's claims. The Amended Complaint consists mostly of alleged conduct by non-parties with whom the SEC alleges Defendants had "connections." By such allegations, the SEC can *at best* hope to create an inference that because Defendants had prior dealings with the people or entities involved, they must have known about the promotional campaigns. Because merely "knowing about" the campaigns cannot form the basis of liability, however, the SEC jumps from that at-best inference to the conclusion that Defendants must have "arranged" or "been involved with" the campaigns. But these conclusory allegations in the Amended Complaint, like the original complaint, are simply not supported by any particularized facts.

The SEC has brought many enforcement cases in the microcap stock area, but two hallmarks of such cases are glaringly absent here. First, although the Amended Complaint alleges misrepresentations in promotional reports about a public company, it notably does *not* allege that any false or misleading statements were made about the company itself, its business, its prospects, etc. Rather, the alleged omissions relate solely to disclosure of who was supposedly involved with or responsible for the reports. Second, the Amended Complaint does

1

*not* allege that any defendant sold stock, tried to sell stock, intended to sell stock, or in any other way profited or had even intended to profit from the reports alleged to contain misrepresentations.  In trying to plead a case without these common elements, the SEC strings together inferences with labels and conclusions that simply do not add up and fail to meet the requisite pleading standard.

The Amended Complaint alleges omissions with regard to three separate categories of publications concerning a single public company, Empowered Products, Inc. ("EMPO").  With regard to two of the three categories, the May 2012 Promotion and the October 2012 Promotion (now dubbed the Second Promotional Campaign and the Third Promotional Campaign), the publications are alleged to have been false and misleading only in that they omitted to disclose Mr. Fraser's and Contrarian Press' alleged involvement with them.  The alleged involvement, however, is not supported by any factual allegations—rather, the Amended Complaint uses conclusory labels like "arrange" and "undertook," without supplying any facts as to *how* Mr. Fraser or Contrarian Press were involved.  Indeed, the Amended Complaint alleges that someone else wrote the reports, someone else published the reports, someone else financed the reports, someone else distributed the reports, and someone else financed their distribution, yet concludes without any supporting facts that Mr. Fraser and Contrarian Press arranged them.  Absent facts establishing that they did arrange or were involved with them, the reports are not false or misleading and the SEC's claims fail.

The third category of publications, the Contrarian Press Publications (now dubbed the First Promotional Campaign), on the other hand, were actually written and published by Mr. Fraser and Contrarian Press, respectively.  The Amended Complaint alleges they were misleading because some did not disclose Mr. Fraser's dual roles as owner of Contrarian Press

and CEO of EMPO.  It also alleges the reports did not disclose payments made from EMPO to Contrarian Press under a publicly disclosed agreement that the SEC alleges included preparation of these reports.  The Amended Complaint utterly fails, however, to establish that any of the alleged omissions, if true, were material, nor does it articulate any factual basis from which to infer scienter on the part of Mr. Fraser or Contrarian Press, and the Court should thus dismiss it.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS[1]

Mr. Fraser founded Contrarian Press, LLC in 1992 and has owned it ever since.  (*See* Amended Complaint [Doc. No. 62] ("Am. Compl.") ¶ 18.)  Contrarian Press was a publishing company that published stock market related commentary. (Am. Compl. ¶ 18.)  Mr. Fraser founded EMPO in 2002.  (Am. Compl. ¶ 23.)  EMPO manufactures products in the wellness industry.  EMPO went public in 2011 and Mr. Fraser is its President, CEO and a major shareholder.  (Am. Compl. ¶¶ 23-24.)

The Amended Complaint alleges that Mr. Fraser and Contrarian Press were involved with three separate "promotional campaigns" concerning EMPO stock.  (Am. Compl. ¶ 1.)  While the Amended Complaint attaches certain labels to Mr. Fraser, the factual allegations about his or Contrarian Press' actual roles in two of the three "campaigns" are threadbare.

### The May 2012 Promotion

The Amended Complaint alleges that a stock promotional newsletter concerning EMPO was distributed in May 2012. (Am. Compl. ¶ 56.)  Notably, the Amended Complaint does not allege that the newsletter, called Investor Stock Advisory, contained any false or misleading statements concerning EMPO, its business, or its prospects.   (*See* Am. Compl. ¶¶ 44-59.)

---

[1] The relevant allegations are all taken from Plaintiff's Amended Complaint and are assumed to be true only for purposes of this Motion.

Rather, the Amended Complaint alleges that the report was misleading only in that it failed to disclose Mr. Fraser's and Contrarian Press' alleged involvement with it.  (Am. Compl. ¶ 58.)

The Amended Complaint fails, however, to plead any facts illustrating *how* Mr. Fraser or Contrarian Press were involved with the May 2012 promotion.  Instead, the Amended Complaint alleges that someone else organized it, someone else wrote it, someone else published it, someone else distributed it, and someone else paid for it.  (Am. Compl. ¶¶ 45-50.)  The Amended Complaint alleges "Associate 2" owned Silver Crest Equity Research, which published the Investor Stock Advisory newsletter. (Am. Compl. ¶ 47.)  It further alleges that Associate 2 paid some other associate to write the report.  (Am. Compl. ¶ 48.)  It alleges that Associate 2 hired stock promoters to distribute the report.  (Am. Compl. ¶ 49.)  Finally, it alleges that Mass Media Advertising Ltd. ("Mass Media") paid Silver Crest $326,000 to publish the report. (Am. Compl. ¶ 51.)

The Amended Complaint includes new allegations concerning the flow of funds from "Associate 1" through a number of entities to Mass Media Advertising, which then paid Silver Crest.  (Am. Compl. ¶¶ 50-55.)  Notably, there are no allegations that any of the funds were ever in the possession of Fraser or Contrarian Press.  The Amended Complaint even includes a new payment flow illustration that, if true, conclusively establishes that neither Fraser nor Contrarian Press paid for the May 2012 report, nor ever touched the funds that did. (Am. Compl. ¶ 55.)

Thus, every aspect of the May 2012 promotional campaign is alleged to have been performed by someone else.  As for Mr. Fraser's alleged involvement, the Amended Complaint includes only a conclusory allegation that he "arranged" for Associate 2 to organize the campaign. (Am. Compl. ¶ 44.)  But there are no facts alleged as to what this means or what he actually did.  The Amended Complaint also alleges (without any supporting factual detail) that

he "saw and approved" the report. (Am. Compl. ¶ 49.)  Even if *arguendo* that is true, however, there are no allegations that he was involved in its creation, or that his approval was necessary or required.  As for Contrarian Press, there is not a single allegation of any conduct in connection with the May 2012 campaign.

### The October 2012 Promotion

As with the May 2012 report, the Amended Complaint does not allege that the October 2012 report was at all false or misleading with respect to EMPO, its business, its prospects, etc., but rather only that it failed to disclose Mr. Fraser's and Contrarian Press' alleged involvement. (Am. Compl. ¶ 83.)  Again, however, the Amended Complaint's allegations of their involvement are vague and conclusory.

The Amended Complaint alleges that Mr. Fraser and Contrarian Press hired defendant Nathan Yeung ("Mr. Yeung") to undertake a "promotion of EMPO stock (among other tasks)." (Am. Compl. ¶ 60.)  The SEC does not further describe the "other tasks," or allege that they were unlawful or at all problematic.  The Amended Complaint alleges that Contrarian Press paid Mr. Yeung $30,000 for "Media Management Services," and not for any work on a promotional campaign concerning EMPO.  (Am. Compl. ¶ 62.)  The Amended Complaint alleges that Mr. Yeung asked for and received a Contrarian Press email address, but this request could certainly have stemmed from the "other tasks" or the "Media Management Services" at least as far as Contrarian Press and Mr. Fraser were concerned.  (Am. Compl. ¶ 63.)  The Amended Complaint alleges that Mr. Fraser sent an email to Mr. Yeung about a "new project" but does not allege what that meant or whether it referred to the "other tasks" or "Media Management Services." (Am. Compl. ¶ 65.)  There is no indication it related to a promotional campaign about EMPO.

All aspects of the October 2012 report, called the "Aggressive Growth Stock Screener," are alleged to have been undertaken by persons *other than* Mr. Fraser and Contrarian Press. Whereas the original complaint alleged that the report was written by Mason Zhang, an alleged alias of Mr. Yeung, the Amended Complaint deletes that allegation and does not identify who wrote the report.  Mr. Yeung is alleged to have hired stock promoters to distribute it, directed them to a website to download it and provided them with subject lines for emails to distribute it. (Am. Compl. ¶¶ 68, 82.)  The Amended Complaint alleges that an entity named Alpine View Media paid another entity, Crown Pacifica, $586,000 to coordinate the distribution of the report. (Am. Compl. ¶¶ 77, 83.)

There are no allegations that Mr. Fraser or Contrarian Press directed any of Mr. Yeung's efforts with the report or even that either one "reviewed and approved" it, as vaguely alleged with the May 2012 report.  (*See* Am. Compl. ¶ 49.)  Mr. Fraser's alleged involvement appears to be limited to forwarding to Mr. Yeung a copy of the May 2012 report in August 2012 and sending Associate 1 Crown Pacifica's wire instructions.  (Am. Compl. ¶¶ 76, 80.)  But there are no allegations that there was any type of instructions, directions, or even request associated with either transmission and nothing whatsoever that ties either to the October 2012 report.  Whereas the original complaint vaguely suggested that Mr. Yeung discussed the report with Mr. Fraser in Las Vegas, the Amended Complaint clarifies that did not happen and that Mr. Fraser was not a party to any meetings concerning the October 2012 report.  (Am. Compl. ¶ 70.)

The Amended Complaint alleges that Mr. Yeung sent the stock promoters that he had hired "promotional materials that he *and others at Contrarian Press* had created."  (Am. Compl. ¶ 82 (emphasis added).)  This is the only allegation that either Mr. Fraser or Contrarian Press had any actual involvement in the creation of any materials.  However, this allegation is hopelessly

vague as it does not identify who at Contrarian Press created materials, what the materials were, when they were created, or what role anyone at Contrarian Press played, as opposed to Mr. Yeung who is alleged elsewhere in the Amended Complaint to have organized the promotional report and was alleged in the original complaint to have drafted it.  (Am. Compl. ¶ 60.)

As with the May 2012 promotion, the Amended Complaint adds new allegations concerning the flow of funds to pay for the October 2012 promotion. (Am. Compl. ¶¶ 76-79.) Again, the allegations make clear that neither Mr. Fraser nor Contrarian Press paid for the promotion or ever possessed the funds that did.  (*Id.*)

The Amended Complaint also adds new allegations concerning the involvement of who the SEC misleadingly dubs, "Contrarian Press IT Specialist," presumably intending to suggest that the person is employed by Contrarian Press, which is not alleged.  (Am. Compl. ¶¶ 63, 81, 90.)  The Amended Complaint does allege, "Fraser and Contrarian Press hired Contrarian Press IT Specialist," but notably does not, and cannot, allege that they did so for anything at all relating to the October 2012 promotion.  (Am. Compl. ¶ 66.)  Instead, it plainly alleges that he was paid for any work associated with the October 2012 promotion by Alpine View.  (Am. Compl. ¶ 90.)

### The Contrarian Press Publications

In stark contrast to the allegations concerning the May 2012 and October 2012 EMPO promotions, the Contrarian Press Publications in September and October 2011 (which the Amended Complaint now describes as the First Promotional Campaign) were at least written by Mr. Fraser and published by Contrarian Press.  (*See, e.g.* Am. Compl. ¶ 32.)  Once again, however, the Amended Complaint does not allege that the Contrarian Press reports contained any false or misleading statements concerning EMPO, its business, or its prospects.  Rather, the Amended Complaint alleges they were misleading because they did not all disclose that Mr.

Fraser was both the owner of Contrarian Press and also EMPO's CEO, and because some were written under Mr. Fraser's longtime pseudonym "Charlie Buck."  (Am. Compl. ¶¶ 32-33.)

The Amended Complaint also alleges that Contrarian Press was paid to publish these reports by EMPO itself and that the reports failed to disclose the payments.  (Am. Compl. ¶ 35.) This claim is based on a tortured reading of a generic recital paragraph in an Investor Relations/Sales and Marketing Agreement (which the Amended Complaint dubs the "Investor Relations Agreement" to appear more consistent with its strained allegations) entered into by Contrarian Press and EMPO that describes Contrarian Press' general objectives in entering such agreements with its clients.  (Am. Compl. ¶ 30.)  It is not based on any of the operative terms of the contract, none of which are alleged in the Amended Complaint.[2]

The Amended Complaint alleges that these publications were distributed to Contrarian Press' own subscribers (Am. Compl. ¶ 42), unlike the May and October 2012 reports, which are alleged to have been distributed by third-party paid stock promoters to "hundreds of thousands" and "over 3 million" prospective investors, respectively.  (Am. Compl. ¶¶ 56, 82, 85.)

**The Amended Complaint's Lack of Allegations Establishing Scienter**

Common among all three alleged "campaigns" is the lack of any allegations that any of the reports were substantively false or misleading concerning EMPO, the subject of the reports. Rather, the reports are alleged to have been false and misleading only in omitting Mr. Fraser's and Contrarian Press' alleged involvement.  (Am. Compl. ¶¶ 58, 83.)  There are no allegations, however, as to why Mr. Fraser or Contrarian Press would seek to conceal their involvement.

---

[2]  The Contrarian Press Investor Relations/Sales and Marketing Agreement was publicly disclosed as a related party agreement (due to Mr. Fraser's ownership) from EMPO's very first Form 10-K.  (*See* Defendant Scott Fraser and Contrarian Press, LLC's Request for Judicial Notice filed and served concurrently herewith ("Defendants' RJN") at Exhibit 1.

Contrarian Press is not alleged to have ever been an EMPO shareholder. Mr. Fraser is an EMPO shareholder, but is not alleged to have ever sold a single share of EMPO stock. He is not alleged to have ever tried to sell a single share of EMPO stock. He is not alleged to have ever intended to sell a single share of EMPO stock. He is not even alleged to have had the *ability* to sell a single share of EMPO stock (e.g., he is not alleged to have held his shares in a brokerage account from which sales could have been made).

Neither Mr. Fraser nor Contrarian Press is alleged to have received any compensation for the May 2012 or October 2012 promotions. Contrarian Press is alleged to have received monthly payments for its publications from EMPO under a publicly disclosed contract (Am. Compl. ¶ 31), but there is no allegation as to how or why not disclosing these alleged payments in the Contrarian Press publications was of any benefit to Contrarian Press. The Amended Complaint is devoid of any allegations establishing a motive or anything to gain on the part of Mr. Fraser or Contrarian Press.

## THE NEW ALLEGATIONS IN THE AMENDED COMPLAINT FURTHER ACCENTUATE ITS DEFICIENCIES

As discussed above, the new allegations the SEC added to the Amended Complaint have very little to do with Mr. Fraser or Contrarian Press. Instead, they relate almost exclusively to third parties. They appear designed merely to throw into the mix more connections between Mr. Fraser and/or Contrarian Press and third parties who appear to have played some role in the May 2012 and October 2012 Promotions. In doing so, the SEC has made abundantly clear that it has not alleged, and cannot allege, that Mr. Fraser or Contrarian Press wrote the May 2012 or October 2012 promotional reports, published the reports, distributed the reports, or paid for the publication or distribution of the reports. The SEC can still only allege in conclusory fashion,

without any particularized facts, that Mr. Fraser "arranged" for the promotions.  (Am. Compl. ¶¶ 44-45, 83.)

Assuming that the SEC can prove every alleged connection to these third parties, the best it can possibly achieve is an inference that Mr. Fraser or Contrarian Press may have "known about" the May 2012 and October 2012 Promotions.  The SEC cannot allege, however, that Mr. Fraser or Contrarian Press "knowing about" the reports would have been at all unlawful.  Indeed, it would not have been.  Because neither Mr. Fraser nor Contrarian Press wrote or published the communications, they had no control over their content and therefore no ability, *or duty*, to disclose any information in the promotional reports.  *See Janus Capital Group v. First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011) (under Section 10(b), primary liability is confined to "the maker of the statement," defined as "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").

Moreover, the only material information that the SEC alleges was omitted from the May 2012 and October 2012 Promotions was Mr. Fraser's and Contrarian Press' supposed involvement with, or arrangement of, the promotions. (Am. Compl. ¶¶ 58, 83.)  But again, the SEC has simply not alleged facts that either did, in fact, arrange for or have involvement with the promotions.  Merely *knowing about* the promotions—the most the SEC can hope to prove based on the allegations in the Amended Complaint—does not constitute arranging or being involved in the promotions.  Thus, the SEC has not, and obviously cannot, allege facts sufficient to support its alleged omission theory.  The new allegations added to the Amended Complaint merely serve to solidify this conclusion even further, as more fully discussed below.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face."  *Ashcroft v. Iqbal*,

556 U.S. 662, 676 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

*Twombly* sent into "retirement" the notion that a complaint could only be dismissed if there was "no set of facts" to support the claims.   Under *Iqbal* and *Twombly*, a complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to reach a reasonable inference that the defendant is liable for the conduct alleged.   While well-pled facts are accepted as true at the motion to dismiss stage, "unwarranted deductions of fact are not admitted."   *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005).   Similarly, a court may not accept as true on a motion to dismiss labels and legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

Where, as here, a party alleges fraud, Rule 9(b) of the Federal Rules of Civil Procedure imposes heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss.   *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484 (S.D.N.Y. 2007).   The rule requires this particularity to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."   *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quotations and citations omitted).   It requires that the complaint "state with particularity the circumstances constituting fraud."   The plaintiff must plead "the who, what, when, where, and how" of the alleged fraud.   *United States ex rel. Ramos v. Icahn Sch. of Med.*, 2015 WL 5472933, at *3 (S.D.N.Y. Sept. 16, 2015).

A plaintiff is also required to specify which facts correspond to which alleged violations. Pleadings in which it is impossible to know which allegations of fact are intended to support

which forms of relief are inadequate to survive dismissal.  *See e.g., In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing fraud claim where plaintiff neglected "to make it clear what part of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.  This method is deficient under the pleading standards."); *Provda v. Farkas*, 1994 WL 542267, at *2 (S.D.N.Y. Oct. 5, 1994) ("When the alleged frauds are based on omissions, the pleading must specify both the statements that were made false or misleading by the omissions and the corresponding facts which demonstrate the facts are false."). Neither a district court nor the defendants are required to sift through the facts presented and decide which are material to the particular cause of action asserted.  *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d at 534.

## ARGUMENT

As set forth more fully below, Plaintiff's Amended Complaint fails to allege facts sufficient to support any of its claims, each of which should, therefore, be dismissed with prejudice.

I.    **The Amended Complaint Fails to State a Claim as to the 2012 Promotions**

A.    **Section 10(b) and Rule 10b-5**

To show a primary violation of Section 10(b) and Rule 10b-5, "the SEC must show: (1) material misrepresentations or materially misleading omissions; (2) in connection with the purchase or sale of securities; (3) made with scienter."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

1.    **The Amended Complaint Does Not Allege That Mr. Fraser or Contrarian Press Made Any Statements or Engaged in Any Deceptive Acts**

Count Two fails because Plaintiff has failed to allege that Mr. Fraser or Contrarian Press were the "makers" of any statements in the May or October 2012 promotional reports or otherwise engaged in any deceptive conduct (even *after* having reviewed Defendants' original motions to dismiss, and having amended its complaint with the benefit of the arguments in those motions).  In *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), the Supreme Court addressed the difference between primary liability versus aiding and abetting liability under Section 10(b).  The Court held that under Section 10(b), only those who themselves commit a "manipulative or deceptive act" in connection with the purchase or sale of securities are primary violators of the statute.  The proscription in Section 10(b), the Court stated, "does not include giving aid to a person who commits a manipulative or deceptive act" and "[w]e cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute."  *Id*. at 177-78.  After *Central Bank*, Congress amended the Securities Exchange Act to authorize the SEC to bring aiding and abetting claims, but did not change *Central Bank's* requirement that a defendant engage in deceptive acts to be liable as a primary violator.

More recently, in *Janus Capital Group v. First Derivative Traders*, the Supreme Court reiterated the distinction it had recognized in *Central Bank* between primary liability and aiding and abetting liability under Section 10(b).  131 S. Ct. 2296 (2011).  It held that under Section 10(b), primary liability is confined to "the maker of the statement," which the Court defined as "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id*. at 2302.  The Court stated, "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."  *Id*.  It stated that the rule followed from its decision in *Central Bank*, and that "[a] broader reading of 'make,'

including persons or entities without ultimate control over the content of a statement, would substantially undermine *Central Bank*." *Id.*

Here, there is still not a single factual allegation that Mr. Fraser or Contrarian Press engaged in a deceptive act or had ultimate authority or control over the content of the statements in the May or October 2012 promotional reports.  Likewise, Mr. Fraser and Contrarian Press are not alleged to have written, published or distributed the May or October 2012 reports.  On the contrary, the Amended Complaint specifically alleges that *others* did.

For example, regarding the May 2012 report, "Associate 2," through Red Rock Marketing and Silver Crest Equity, is alleged to have been responsible "for hiring copy writers and approving the substance and distribution of the newsletter." (Am. Compl. ¶¶ 45, 47.) "Associate 2" is further alleged to have owned Silver Crest Equity Research, which published a stock investment newsletter called the "Investor Stock Advisory." (*Id.*)  "Associate 2" is also alleged to have hired some other associate to write the newsletter. (Am. Compl. ¶ 48.) Moreover, the SEC's new allegations and payment flow chart (Am. Compl. ¶¶ 50-55), if true, demonstrate conclusively that neither Mr. Fraser nor Contrarian Press paid for the May 2012 Promotion either or made or received any payments in connection with it.

Similarly, for the October 2012 report, Mr. Yeung is alleged to have been responsible for publishing and distributing the "Aggressive Growth Stock Screener" newsletter with the help of "Crown Pacifica Media Services" and stock promoters he allegedly hired, whom he directed to a website to download promotional material.  (Am. Compl. ¶ 82.)  The SEC's new allegations concerning the flow of funds (Am. Compl. ¶¶ 76-79) again make clear that neither Mr. Fraser nor Contrarian Press paid for the promotion either or ever possessed the funds that did.

Accordingly, under the clear language of Section 10(b) and the controlling Supreme Court decisions discussed above, neither Mr. Fraser nor Contrarian Press can be a primary violator of Section 10(b) because neither is alleged to be the maker of any statements.  To the extent the SEC attempts to avoid the impact of *Janus* by alleging "scheme liability" under subsections (a) and (c) of Rule 10b-5,[3] such an end-run should be rejected.  "[W]hen the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the SEC's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"  *Kelly*, 817 F. Supp. 2d at 343 (citations omitted); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377-378 (S.D.N.Y. 2006) ("Because the core misconduct alleged is in fact a misstatement, it would be improper to impose primary liability on [defendant] by designating the alleged fraud a "manipulative device" rather than a "misstatement"); *SEC v. Wey*, 246 F. Supp. 3d 894, 917 (S.D.N.Y. 2017) ("[c]laims for scheme liability 'hinge[] on the performance of an inherently deceptive act that is distinct from an alleged misstatement'").  There can be no question here that the primary, and in fact only, alleged fraudulent conduct consists of misstatements—i.e., the omission of statements concerning Mr. Fraser's and Contrarian Press' alleged involvement.  Beyond labels and conclusions, there are no inherently deceptive acts or other facts establishing participation in any scheme alleged.  Any attempt by

---

[3] Rule 10b-5 proscribes three categories of activity relating to the purchase or sale of securities: "(a) To employ any device, scheme or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  So-called "misstatement liability" falls under subsection (b).  *See SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011).

the SEC to avoid the requirement that Mr. Fraser and Contrarian Press have been the speaker by alleging scheme liability instead must be rejected. *Id.*

### 2. The Amended Complaint Does Not Allege Facts Creating a Strong Inference of Scienter

In order to plead intent to deceive, the SEC must allege facts giving rise to "a strong inference" of fraudulent intent. *Wey*, 246 F. Supp. 3d at 911 (applying "the Second Circuit's 'strong inference' standard under Rule 9(b)"); *see also SEC v. China Northeast Petroleum Holdings Ltd*, 27 F. Supp. 3d 379, 388-89 (S.D.N.Y. 2014) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). The SEC may only achieve this by showing: (1) that Mr. Fraser and Contrarian Press had motive and opportunity to commit fraud; or (2) conscious misbehavior or recklessness. *Id.*; *SEC v. Treadway*, 430 F. Supp. 2d 293, 331 (S.D.N.Y. 2006).

### a. The Amended Complaint Fails to Allege That Mr. Fraser or Contrarian Press Had Any Motive

In order to demonstrate motive, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. However, Plaintiff's Amended Complaint fails to allege a single fact suggesting that Mr. Fraser or Contrarian Press personally benefitted in any way, concrete or otherwise, from any alleged conduct in connection with the May and October 2012 promotions. The SEC does not, for example, allege that Mr. Fraser or Contrarian Press: (1) were paid for the campaigns; (2) received any compensation from anyone as a result of the campaigns; (3) sold any shares of stock; (4) tried to sell any shares of stock; or (5) had the ability to sell any shares of stock (e.g., even had shares in a brokerage account that could potentially have been sold).[4]

---

[4] The Amended Complaint seeks disgorgement of ill-gotten gains, but does not allege that Mr. Fraser and Contrarian Press *had* any gains, or even a plan by which they hoped for gains, in connection with the May and October 2012 campaigns. Moreover, the Amended Complaint fails to articulate any basis on which the SEC is entitled to seek disgorgement. The SEC has

The campaigns are alleged to have been distributed to third parties (potential shareholders) (Am. Compl. ¶ 56), but there is no allegation (nor could there be) that the company had any offering in the works, so the only place those potential shareholders could purchase shares was in the secondary (OTC) market.  Purchases of shares in the market would not benefit the company or its officers unless they were selling their own shares, but there is no allegation that Mr. Fraser or Contrarian Press had any shares in the market for sale.  While Plaintiff alleges that EMPO trading volume spiked as a result of the May 2012 promotional campaign (Am. Compl. ¶ 59), it fails to specify what, if any, benefit Mr. Fraser or Contrarian Press derived or could have expected to derive therefrom.

As previously noted, the only alleged misrepresentation relating to the 2012 Promotions is the omission of Mr. Fraser's and Contrarian Press' alleged involvement; however, there are no allegations explaining how such omissions would or could have been of any benefit to them.  Nor does the SEC even allege that the involvement of Mr. Fraser or Contrarian Press would have itself been unlawful.  Thus, even if either had actually been involved, there would have been no apparent incentive to conceal it.  The SEC alleges that omission was designed to create the appearance of an unbiased report.  (*See, e.g.,* Am. Compl. ¶ 4.)  But even if that were true and it was successful, there are no allegations as to how that would have been of any use or benefit to

---

traditionally sought disgorgement pursuant to the court's inherent equity powers. *See Kokesh v. SEC*, 137 S. Ct. 1635,1640 (2017). In analyzing 28 U.S.C. § 2462's 5-year statute of limitations, the Supreme Court held that "SEC disgorgement constitutes a penalty," and therefore, Section 2462's statute of limitations applies to that remedy. *Id*. at 1642. In its briefing, the SEC argued that disgorgement was not a penalty because it was an "equitable or remedial remedy." *Id*. at 1644. The Court expressly and unequivocally rejected this argument. *Id*. Because disgorgement is a penalty, the SEC cannot obtain it pursuant to the Court's inherent equity powers, but rather only pursuant to statute. *See U.S. v. Parkinson*, 240 F.2d 918, 922 (9th Cir. 1956); *Tull v. U.S.*, 481 U.S. 412, 422 (1987). Because Congress has never explicitly authorized disgorgement among the remedies the SEC can seek, the SEC has no legal basis to seek it.

Mr. Fraser or Contrarian Press.  Without any such allegations, there is no demonstration of motive upon which this Court may find a strong inference of scienter.

        b.      **The Amended Complaint Fails to Allege Any Conscious Misbehavior or Recklessness**

A plaintiff in a fraud action may also plead scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).  The Second Circuit has stated that recklessness "must, in fact, approximate an actual intent to aid in the fraud being perpetrated." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982).  Reckless conduct is defined as, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308.  An allegation that a defendant merely "ought to have known" is not sufficient to allege recklessness. *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001).

For the May 2012 campaign, the Amended Complaint contains a single conclusory sentence about Mr. Fraser's mental state: "Therefore Fraser knew (or recklessly) disregarded that Investor Stock Advisory was issuing a promotional newsletter about EMPO before it was distributed to prospective investors."  (Am. Compl. ¶ 49.)  Not only is this a mere conclusion, but even if true, the Amended Complaint does not allege what, if anything, would be unlawful about either the issuance of the newsletter or Mr. Fraser having knowledge of same. (*See id.*)  Thus, the Amended Complaint utterly fails to allege "strong circumstantial evidence of conscious misbehavior or recklessness" as to the May 2012 campaign.

For the October 2012 campaign, the Amended Complaint again includes a single conclusory sentence regarding Mr. Fraser's mental state, alleging that Mr. Fraser "knew (or

recklessly) disregarded that the newsletter and the promotional campaign were deceptive" based on the allegations that he: (a) hired Mr. Yeung; (b) understood that Mr. Yeung was using a pseudonym; (c) supplied Mr. Yeung with a model for the promotional newsletters; and (d) understood that Crown Pacifica was merely a "straw man" to hide Contrarian Press' management of the promotional campaign. (Am. Compl. ¶ 84.) This conclusory assertion regarding Mr. Fraser's mental state and the flimsy factual allegations purportedly supporting the same fail to establish the requisite level of scienter, as detailed below.

To begin, several of the underlying factual allegations are *themselves* conclusory: The Amended Complaint attaches labels such as "model" and "straw man" but there are no facts alleged to support them. Mr. Fraser is alleged to have sent an email to Mr. Yeung in August 2012 attaching a copy of the May 2012 newsletter. (Am. Compl. ¶ 80.) Period. Those are the facts. From there, the SEC leaps to the conclusory allegation that it was sent as "a model for the promotional newsletters" without any factual basis to do so. The Amended Complaint labels Crown Pacifica a "straw man for Contrarian Press" (*see, e.g.,* Am. Compl. ¶¶ 88, 84) but without a single factual allegation that Contrarian Press had anything whatsoever to do with it.[5] The Amended Complaint alleges that Mr. Fraser was copied on an email providing Mr. Yeung with the email address mz@contrarianpress.com. (Am. Compl. ¶ 63.) From there, the SEC leaps to Mr. Fraser's supposed knowledge that Mr. Yeung was using the pseudonym Mason Zhang (*id.*) without any supporting facts as to how he would have known that, why it would have been

---

[5] The Amended Complaint now alleges that Mr. Fraser sent an email to Associate 1 attaching wire instructions for a Crown Pacifica bank account, but does not allege that he gave any directions or instructions, made any requests or said *anything* in the email, let alone anything relating to the October 2012 Promotion. (*See* Am. Compl. ¶ 76.) Even assuming *arguendo* that Mr. Fraser sent the wire instructions as alleged, this does not demonstrate that he (let alone Contrarian Press) conducted, controlled, or had any input into the alleged stock promotion, much less that he paid for it or hoped to profit from it.

relevant to him, or whether it could have related to the presumptively lawful "other tasks" invoiced by Mr. Yeung as "Media Management Services" for which the Amended Complaint acknowledges Mr. Yeung was hired.  (Am. Compl. ¶¶ 60, 62.)  The Amended Complaint alleges that Mr. Yeung used the pseudonym to "hide his true identity" (Am. Compl. ¶ 63) but there are no facts alleged to support this characterization or indicate why he would even want or need to hide his identity.

Indeed, Mr. Fraser's alleged conduct hardly rises to the level of conduct which could be described as "highly unreasonable" or which represents "an extreme departure from the standards of ordinary care."  The Amended Complaint lacks specific factual allegations supporting any inference of conscious misbehavior or recklessness and, as such, Plaintiff's claim under Exchange Act Section 10(b) and Exchange Act Rule 10b-5 fails, and the Court should dismiss Count One against Mr. Fraser and Contrarian Press.

B.   **The Amended Complaint Does Not State a Section 17(b) Claim for the May 2012 and October 2012 Promotions**

Section 17(b) of the Securities Act makes it:

> unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q(b). Thus, "[i]n order to violate Section 17(b), a person must (1) publish or otherwise circulate (using a means of interstate commerce), (2) a notice or type of communication (which describes a security), (3) for consideration received (past, currently, or prospectively, directly or indirectly), (4) without full disclosure of the consideration received and the amount." *Id.*; *SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1105 (C.D. Ill. 2001).

20

Here, the Amended Complaint does not allege that Mr. Fraser or Contrarian Press published or otherwise circulated the May 2012 or October 2012 promotional reports. Rather, the Amended Complaint specifically alleges that others did. (Am. Compl. ¶¶ 47, 49, 68, 82-83) Because Section 17(b) is an obligation exclusively of publishers and Mr. Fraser and Contrarian Press are not alleged to have published the May 2012 and October 2012 reports, they cannot be liable for violations of Section 17(b).

Moreover, Section 17(b) requires only the disclosure of the receipt of compensation and the amount thereof. "Section 17(b) contains two forms of disclosure: (1) that a promoter disclose his status as such, and (2) that a promoter disclose how much he is paid for his promotions." *U.S. v. Wenger*, 427 F.3d 840, 849-50 (10th Cir. 2005); *see also Gorsek*, 222 F. Supp. 2d at 1106 ("Section 17(b) calls for the disclosure of the receipt of compensation and the amount."); *SEC v. Thompson*, 238 F. Supp. 3d 575, 596 (S.D.N.Y. 2017). Here, both the May 2012 and October 2012 reports are alleged to have included disclaimers advising readers that the reports were paid for, the amount that was paid, and, although not required by the statute, the source of the payments as well. (Am. Compl. ¶¶ 46, 62.) Thus, both 2012 reports fully satisfy Section 17(b), which has not been violated by Mr. Fraser, Contrarian Press or anyone else.

C.   **Claims for Aiding and Abetting Violations of Sections 10(b) and 17(b) Fail**

The Court should also dismiss Plaintiff's aiding and abetting claim (Count Three) against Mr. Fraser because it fails to allege sufficient facts to establish any of the requirements for aiding and abetting liability. To establish aiding and abetting liability, the SEC must allege: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (citations omitted). None of these elements are met.

1. **The Amended Complaint Fails to Adequately Allege a Primary Violation of Exchange Act Sections 10(b) or 17(b) or Mr. Fraser's Knowledge or Reckless Disregard of Same**

To allege aiding and abetting liability, plaintiffs must first properly allege a primary violation of the securities laws by a primary party, *see SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009), and that the aider and abettor had actual knowledge of, or recklessly disregarded, the same. *Wey*, 246 F. Supp. 3d at 926. As a preliminary matter, and as discussed above, *see supra* §§ I(A) and (B), the Amended Complaint does not adequately allege primary violations of either Sections 10(b) or 17(b) because there are no allegations that Defendants: (a) were involved in any misrepresentation or omission; (b) had the requisite intent; or (c) published or otherwise circulated any of the May or October 2012 reports. Thus, the SEC's aiding and abetting claims related to those alleged violations also fail and Count Three should, therefore, also be dismissed.

2. **The Amended Complaint Fails to Adequately Allege Mr. Fraser Provided Substantial Assistance**

Plaintiff also fails to allege facts demonstrating that Mr. Fraser "substantially assisted" any primary violation. "[T]o satisfy the 'substantial assistance' component of aiding and abetting, the SEC must show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d] in it as something he wish[ed] to bring about, [and] that he [sought] by his action to make it succeed." *Apuzzo*, 689 F.3d at 206.

Here, apart from the Amended Complaint's labels and conclusions, there are no facts alleged to show that Mr. Fraser or Contrarian Press substantially assisted the 2012 Promotions, let alone any fraud with respect to them. In fact, there is no fraud alleged. The supposed fraud is the failure to disclose that Mr. Fraser and Contrarian Press were behind the promotions. But there are no particularized allegations demonstrating that they *were* actually orchestrating the promotions (or even *influencing* them). On the contrary, the Amended Complaint alleges that

someone else wrote, paid for, published and distributed the reports.  The SEC has now added allegations attempting to draw "connections" between Fraser and one of the alleged participants in the May 2012 Promotion (Mass Media), but by the SEC's own admission, these alleged "connections" have **nothing at all** to do with the alleged facts of this case—indeed, the SEC explicitly alleges that Mr. Fraser's business dealings with Mass Media were "during the period of 2007-2011" (i.e., *prior* to the conduct alleged in the Amended Complaint) and were "unrelated to EMPO." (Am. Compl. ¶ 52.)  Merely alleging that Mr. Fraser had previously dealt with Mass Media does not somehow make him liable for (or even *aware* of) Mass Media's involvement in the subject promotions.[6]  *See In re Psychemedics Corp. Secs. Litig.*, No. 17-10186, 2017 U.S. Dist. LEXIS 183955, at *13-14 (D. Mass. Nov. 17, 2017) (rejecting plaintiff's attempt to impute "actions or statements undertaken by corporate officers in Company A [to] Company B" for scienter purposes, "no matter how 'close' their working relationship").  Similarly, the SEC's newly alleged connections between Mr. Fraser and alleged participants in the October 2012 Promotion fare no better as none are alleged to have related to the promotional campaign.  (Am. Compl. ¶¶ 76-79.)

In sum, apart from conclusory allegations, there are no facts alleged that Mr. Fraser or Contrarian Press, in fact, assisted these campaigns in any manner.  Absent factual allegations supporting their actual involvement, the reports were not false and misleading and thus there was no fraud in which Mr. Fraser and Contrarian could have materially assisted.

---

[6] Likewise, and *a fortiori*: the SEC's allegation that an *employee* of EMPO had connections to Mass Media does not somehow render Mr. Fraser responsible for Mass Media's conduct.  (*See* Am. Compl. ¶ 52.)

II.     **The Amended Complaint Fails to State a Claim as to the Contrarian Press Publications**

In stark contrast to the 2012 Promotional Campaigns, the SEC actually alleges that Mr. Fraser and Contrarian Press were involved in the Contrarian Press Publications.  For example, the SEC asserts that the Contrarian Press Publications were written by Mr. Fraser and published by Contrarian Press.  (Am. Compl. ¶¶ 20, 32.)  The Amended Complaint admits as it must, however, that these reports were only sent to Contrarian Press' own internal subscribers, for a company Mr. Fraser has owned and operated since 1992 (Am. Compl. ¶ 18), and not to external lists through "stock promoters" as alleged with the May and October 2012 promotions.  (Am. Compl. ¶¶ 47, 56, 82.)

The Amended Complaint fails, nonetheless, to state claims for any violation of Section 10(b) and Rule 10b-5 (against either of the Defendants) or Exchange Act Section 17(b) (against Mr. Fraser) because the Amended Complaint once again fails to allege that: (a) the Contrarian Press Publications contained any materially false or misleading statements concerning EMPO, its business or its prospects; (b) Mr. Fraser or Contrarian Press had the requisite scienter, including any motive, under Section 10(b); or (c) Mr. Fraser published the Contrarian Press Publications.

A.     **Section 10(b) and Rule 10b-5**

As explained above, in order to show a primary violation of Section 10(b) and Rule 10b-5, the SEC must show: "(1) material misrepresentations or materially misleading omissions; (2) in connection with the purchase or sale of securities; (3) made with scienter."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

1.     **The Amended Complaint Fails to Allege a Material Misrepresentation or Materially Misleading Omission**

The Amended Complaint fails to allege a material misrepresentation or materially misleading omission required for Section 10(b) liability.  Similar to the 2012 Promotions, the

24

SEC does not allege that the Contrarian Press reports contain any substantively false or affirmative misleading assertion about EMPO.  Rather, the Amended Complaint alleges that Mr. Fraser and Contrarian Press failed to disclose the full extent of Mr. Fraser's involvement and Contrarian Press' purported compensation.  (*See* Am. Compl. ¶¶ 32, 35, 38.)  However, the SEC fails to allege or explain how or why those omissions were material.  Indeed, while the SEC alleges that the Contrarian Press Publications had an impact on the volume of trading in EMPO's stock (Am. Compl. ¶ 43), it makes no such allegation regarding any impact on its trading price. That is because it simply cannot do so.  During the relevant time period for the Contrarian Press Publications, EMPO's share price never climbed above $1.25 (not even intraday), which is the same price it was trading at in the weeks leading up to the Contrarian Press Publications.[7]

Moreover, the SEC's allegation of volume impact is itself misleading.  The Amended Complaint alleges that "EMPO's shares began trading on or about July 19, 2011" and that between then and September 5, had "average daily trading volume of 365 shares per day."  (Am. Compl. ¶ 43.)  What the SEC conveniently omits with this allegation is that the stock was first listed on July 13, there was *one trade* on July 19 for 1,000 shares and then not a single trade in the stock for 37 days until August 25, notably before any of the September and October 2011 Contrarian Press Publications.  From there, the stock finally began to trade on a somewhat regular basis.  The SEC used all of the zero trading days before August 25 in calculating its 365 shares per day average.  If the average trading volume is instead calculated beginning with August 25, when the stock actually began trading somewhat regularly, the average daily trading volume from then up until September 5 was 1,629 shares.  Thus, the subsequent average trading

---

[7] For purposes of this Rule 12(b)(6) motion, Defendants request that the Court take judicial notice of EMPO's historical stock price and trading volume during the period at issue. (*See* Defendants' RJN, Exhibit 2.)

volume of 1,263 shares that the SEC attributes to the publications actually represents a ***decline in volume***, not a "240% increase."  (*See* Defendants' RJN, Exhibit 2 at p. 51-53 of 53.)

The SEC's allegations regarding the impact of the Contrarian Press Publications on EMPO's trading price or volume actually establish the complete lack of materiality.  *See, e.g., United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014) ("Because in an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock,' if a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed…was immaterial.'") (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3rd Cir. 2000)).

### 2.   The Amended Complaint Fails to Allege Facts Creating a Strong Inference of Scienter in Relation to the Contrarian Press Publications

In order to plead scienter, the SEC must allege facts giving rise to "a strong inference" of fraudulent intent.  *Wey*, 246 F. Supp. 3d at 911.  The SEC may only achieve this by showing: (1) that Mr. Fraser and Contrarian Press had motive and opportunity to commit fraud; or (2) conscious misbehavior or recklessness.  *Id.*

### a.   The Amended Complaint Fails to Allege That Mr. Fraser Had Any Motive

In order to demonstrate motive, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *Novak*, 216 F.3d at 307-08.  However, Plaintiff has, once again, failed to allege any facts demonstrating that Mr. Fraser benefitted in any way from any of the alleged conduct in connection with the Contrarian Press Publications. Although the SEC alleges that EMPO paid Contrarian Press for the Contrarian Press Publications, the Amended Complaint does not allege that Mr. Fraser: (a) was directly paid for the campaigns; (b) received any compensation from anyone as a result of the campaigns; (c) sold

any shares of EMPO stock during or after the campaigns; (d) tried to sell any shares of EMPO stock during or after the campaigns; or (e) had the ability to sell any shares of stock.

> b.   **The Amended Complaint Fails to Allege Any Conscious Misbehavior or Recklessness on the Part of Mr. Fraser or Contrarian Press**

A plaintiff in a fraud action may also plead scienter "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). Here, like the 2012 Promotions, Plaintiff makes a single conclusory allegation regarding Mr. Fraser's mental state in relation to the Contrarian Press Publications, alleging that "Fraser—who obviously understood his dual roles at Contrarian Press and EMPO and knew about the Investor Relations Agreement—knew (or recklessly disregarded) that these newsletters were materially false and misleading." (Am. Compl. ¶ 41.) Again, this conclusory assertion regarding Mr. Fraser's mental state and the threadbare factual allegations purportedly supporting the same fail to establish the requisite level of scienter.

Moreover, Defendants' alleged failure to disclose in the publications the payments from EMPO under the Investor Relations/Sales & Marketing Agreement does not support an inference of scienter. The Amended Complaint is drafted to suggest that the agreement was some secret, undisclosed side deal pursuant to which EMPO was paying Contrarian Press. The agreement, however, was no secret at all. The Investor Relations/Sales & Marketing Agreement was executed on July 1, 2011 (Am. Compl. ¶ 29) and was publicly disclosed as a related-party contract (due to Mr. Fraser's dual roles) from the first time such disclosure was ever required, in EMPO's Form 10-K for the year ended December 31, 2011. (*See* Defendants' RJN at Exhibit 1.) Although that was in April 2012 and after the particular 2011 Contrarian Press Publications at issue here, given "his dual roles at Contrarian Press and EMPO," Mr. Fraser obviously knew that the agreement and the payments would soon be publicly disclosed. That the agreement was

disclosed when first required, and at all times since, in full compliance with the law, does not support an inference of fraudulent intent. Rather these facts support an inference that the payments were not disclosed in the Contrarian Press Publications for a lawful reason—that the payments made under the agreement were not at all related to these publications.

The Amended Complaint lacks specific factual allegations supporting any inference of conscious misbehavior or recklessness in relation to the Contrarian Press Publications and, as such, Plaintiff's Section 10(b) and Exchange Act Rule 10b-5 must be dismissed.

B. **The Amended Complaint Does Not State a Section 17(b) Claim Against Mr. Fraser for the Contrarian Press Publications**

As set forth above (*supra* § I(B)), in order to violate Section 17(b), a person must: (1) publish or otherwise circulate (using a means of interstate commerce), (2) a notice or type of communication (which describes a security), (3) for consideration received (past, currently, or prospectively, directly or indirectly), (4) without full disclosure of the consideration received and the amount." *Gorsek*, 222 F. Supp. 2d at 1105 (C.D. Ill. 2001).

Because Section 17(b) is the exclusive obligation of the publisher, here Contrarian Press (*see* Am. Compl. ¶ 20), and Mr. Fraser is not alleged to have published the Contrarian Press Promotions, he cannot be liable for a primary violation of Section 17(b). Count One must be dismissed against Mr. Fraser to the extent it is based on the Contrarian Press Publications.

III. **The Amended Complaint Fails to State a Claim as to the Additional EMPO Promotions**

The Amended Complaint also includes a cursory discussion of "Additional EMPO Promotions," referencing Contrarian Press newsletters that allegedly mentioned EMPO on October 26, 2012 and November 21, 2012. (*See* Am. Compl. ¶¶ 91-95.) As with the 2011 Contrarian Press publications discussed above, the Amended Complaint fails to state any claim based upon these "additional" publications. Again, the SEC has failed to allege any facts

28

demonstrating that the alleged statements were *material*—indeed, the SEC has not even offered a *conclusory* allegation of materiality as to these publications.  (*See id.*)  Moreover, as a matter of law, the statements were *not* material—they did not increase the price of EMPO stock (one was followed by a significant *decrease* in price), nor did they have any discernible impact on trading volume.  *See Martoma*, 993 F. Supp. 2d at 457; RJN Ex. 2 at p. 42 of 53.  Additionally, as with the other alleged statements discussed above, the Amended Complaint here is utterly devoid of facts demonstrating motive, or any other basis on which to draw the requisite "strong inference" (or indeed *any* inference) of scienter.  *See Wey*, 246 F. Supp. 3d at 911.  The Court should dismiss claims based on these publications.

IV.   **Mr. Fraser Cannot Be Liable Under Exchange Act Section 20(a) because Contrarian Press Is Not Liable**

To state a claim under Section 20 of the Exchange Act, a plaintiff must first establish a primary violation of Section 10(b).  15 U.S.C. § 78t(a).  Where, as here, plaintiff fails to establish an actionable claim under § 10(b), its § 20(a) claims must also be dismissed.  *Kleinman v. Elan Corp.*, 706 F.3d 145, 156 n. 14 (2d Cir. 2013) (affirming dismissal of § 20(a) claims for failure to plead a predicate violation of § 10(b)).

## THE COURT SHOULD GRANT NO FURTHER LEAVE TO AMEND

The Court should deny any request by the SEC for leave to further amend its complaint. Although district courts have broad discretion in deciding whether to grant such a request, leave is properly denied in cases of "repeated failure to cure deficiencies in amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc."  *In re DNTW Chtd. Accountants Sec. Litig.*, 96 F. Supp. 3d 155, 170 (S.D.N.Y. 2015) (citing *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008)); *see also Bd. Of Trs. Of Ft. Lauderdale Gen. Emples Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882

(S.D.N.Y. 2011) (denying as futile plaintiffs' request for leave to further amend in light of prior amendments and the complaint's "fundamental scienter deficiencies").

Here, the SEC's previous failure to cure the deficiencies in its original complaint and more than ample time and opportunity to discover any additional facts both support a finding that any further amendment would be futile. Despite having the benefit of Defendants' previous motion to dismiss, the SEC still has not alleged (nor can it) that Mr. Fraser or Contrarian Press wrote, published, distributed, or paid for the May 2012 or October 2012 promotional reports. Nor is there anything in the Amended Complaint to indicate that another opportunity would change these fundamental facts.

Moreover, given its lengthy pre-suit investigation, the SEC has had more than sufficient opportunity to ascertain whatever facts might have enabled it to plead with the required particularity under Rule 9(b) and governing case law. *See SEC v. Parnes*, No. 01-0763, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001) (dismissing claims for failure to plead with particularity where "the SEC . . . had three years' discovery and access to records and documents"); *SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (applying "the particularity requirements in [a] rigorous manner" where "the SEC [took] the testimony of at least 23 witnesses and conducted extensive document discovery"). The fact that the SEC remains unable to do so, despite a years-long investigation and multiple pleading opportunities, indicates that any additional request for leave to amend would be futile and should be denied.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims against Mr. Fraser and Contrarian Press with prejudice.

Dated: Los Angeles, California.
March 5, 2018

Respectfully submitted,

By:    *s/ Michael J. Quinn*

Michael J. Quinn
Joshua A. Dunn
Vedder Price P.C.
1633 Broadway, 31st Floor
New York, NY 10019
mquinn@vedderprice.com
jdunn@vedderprice.com
212.407.7700

Kevin S. Asfour
K&L Gates LLP
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
kevin.asfour@klgates.com
310.552.5016