```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
SECURITIES AND EXCHANGE                                     :
COMMISSION,                                                 :
                                                            :
                                  Plaintiff,                :     16-CV-6964 (VSB)
                                                            :
                   - against -                              :     OPINION & ORDER
                                                            :
CONTRARIAN PRESS, LLC, et al.,                              :
                                                            :
                                  Defendants.               :
                                                            :
------------------------------------------------------------X
```

Appearances:

Haimavathi V. Marlier
Tejal D. Shah
Securities and Exchange Commission
New York, New York
*Counsel for Plaintiff*

Michael J. Quinn
Vedder Price P.C.
Los Angeles, California

Joshua Alan Dunn
Vedder Price P.C.
New York, New York

Justin H. Roeber
K&L Gates LLP
New York, New York
*Counsel for Defendants Contrarian Press, LLC and Scott S. Fraser*

Thomas O. Gorman
Kimberly Frumkin
Dorsey & Whitney, LLP
Washington, D.C.
*Counsel for Defendant Nathan Yeung*

VERNON S. BRODERICK, United States District Judge:

The Securities and Exchange Commission ("SEC" or "Plaintiff") brings this action against Contrarian Press, LLC ("Contrarian Press") and Scott S. Fraser (collectively, the "Contrarian Defendants"), and Nathan Yeung (Contrarian Press, Fraser, and Yeung are collectively referred to as "Defendants"), alleging that Defendants violated Section 17(b) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(b), and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5; that Defendants Fraser and Yeung aided and abetted those violations with respect to promotional campaigns touting Empowered Products, Inc. ("EMPO"); and that Defendant Fraser violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (*See* Am. Compl.)[1] Before me are Defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Because the amended complaint plausibly alleges violations of Section 17(b) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, and meets the pleading requirements of Federal Rule of Civil Procedure 9(b), Defendants' motions to dismiss are DENIED.

I. **Background**

Defendant Fraser is the President, Chief Executive Officer, Chairman of the Board, and a major shareholder of EMPO, and the founder, owner, and President of Contrarian Press, a

---

[1] "Am. Compl." refers to the Amended Complaint filed in this action on January 22, 2018. (Doc. 62.) The facts referenced in this decision are taken from the Amended Complaint. My references to such factual allegations should not be construed as a finding as to their veracity, and I make no such findings. The original Complaint included seventy-three paragraphs prior to the claims for relief, which each included a paragraph stating that the SEC "re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 73." (*See* Doc. 1, ¶¶ 74, 77, 80, 83.) Although the Amended Complaint includes ninety-five paragraphs prior to the claims for relief, the SEC did not amend the first paragraph of each claim for relief, which also states that the SEC "re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 73." (*See* Am. Compl. ¶¶ 96, 99, 102, 105.) I consider this to be a typographical error, and I consider Paragraphs 96, 99, 102, and 105 to be amended to state that the SEC "re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 95." *See Salem v. City of New York*, No. 17 Civ. 4799 (JGK), 2018 WL 3650132, at *2 n.1 (S.D.N.Y. Aug. 1, 2018) (correcting, sua sponte, a typographical error); *Ripperger v. Schroder-Rockefeller & Co.*, 37 F. Supp. 375, 376 (S.D.N.Y. 1940) (same).

2

publishing company. (Am. Compl. ¶¶ 14, 23, 39.) On or about July 1, 2011, EMPO and Contrarian Press entered into an agreement under which EMPO paid thousands of dollars per month to Contrarian Press, in part, to promote its business and stock. (*Id*. ¶¶ 3, 29–31.)

During September and October 2011, Fraser and Contrarian Press issued promotional newsletters that touted EMPO's stock (the "First Promotional Campaign"). (*Id.* ¶¶ 32–43.) Fraser authored the newsletters, but he concealed his involvement by using the pseudonym "Charlie Buck" referring to himself in the third person in the newsletters, even when they described interviews with Fraser. (*Id.* ¶¶ 32–34, 39.) The newsletters in the First Promotional Campaign included either a disclaimer that the "author . . . does not accept compensation from publicly traded companies in return for his commentary" or that Contrarian Press "did not accept compensation in return for this commentary." (*Id.* ¶¶ 35, 40.)

During May 2012 and October/November 2012, the Contrarian Defendants arranged two more promotional campaigns (the "Second Promotional Campaign" and "Third Promotional Campaign," respectively). (*Id.* ¶¶ 44–90.) The Contrarian Defendants concealed their involvement in the Second Promotional Campaign by arranging for third parties, including associates and other organizations, to manage the campaign and conceal the source of the funds for the campaign. (*Id.* ¶¶ 44–59.) These associates and organizations hired third-party stock promoters. (*Id.* ¶¶ 54–55.) Newsletters issued by these promoters touted EMPO stock. (*See, e.g.*, *id.* ¶ 56 ("'EMPO at around $1.00 could catapult above $15.00 by this time next year . . . .'").) The disclaimers in the newsletters did not disclose the relationship between organizations and individuals who managed and financed the campaign and the Contrarian Defendants. (*Id.* ¶¶ 57–58.)

In 2012, after the Second Promotional Campaign, the Contrarian Defendants hired Yeung

3

"to undertake another surreptitious promotion of EMPO's stock (among other tasks)." (*Id.* ¶ 60.) Contrarian Press paid Yeung $30,000 for the work he did. (*Id.* ¶ 62.) When doing work on the Third Promotional Campaign, Yeung used a pseudonym, "Mason Zhang," for which he had a Contrarian Press email address and a Skype account. (*Id.* ¶¶ 63–64, 68–69.) Yeung hired stock promoters to distribute promotional materials about EMPO. (*Id.* ¶ 68.) Yeung asked Contrarian Press employees to provide him with an example of a past promotional campaign for EMPO. (*Id.* ¶ 80.) In response, Fraser provided Yeung, by email, copies of the promotional materials used to tout EMPO in the Second Promotional Campaign. (*Id.*) Yeung sent promotional materials, which were created by him and other Contrarian Press employees, to third-party stock promoters. Those promotional materials included statements about EMPO such as, "Now is Your Chance to Buy Huge Asset-Growth Beforehand." (*Id.* ¶ 82.) The disclaimers in these materials did not disclose the compensation Yeung received from the Contrarian Defendants, nor did they disclose the role the Contrarian Defendants played in developing the promotional materials. (*Id.* ¶ 83.)

To conceal the involvement of the Contrarian Defendants in the Third Promotional Campaign, Fraser directed his personal assistant, a Contrarian Press employee, to create a new company, Crown Pacifica Media Services ("Crown Pacifica"). (*Id.* ¶¶ 5, 73.) The sole purpose of Crown Pacifica was "to create the appearance that an entity other than Contrarian Press was organizing the EMPO promotion." (*Id.* ¶ 73.) "Crown Pacifica's only business was to receive funds and to transfer those funds, as payment, to the stock promoters that Yeung had already hired." (*Id.*) After the stock promoters addressed invoices to Contrarian Press, Yeung and Fraser's personal assistant asked the promoters to re-issue the invoices to Crown Pacifica. (*Id.* ¶ 75.) In one such request, Yeung stated, "I'll be modifying the insertion orders you sent me . . .

there are some errors . . . via contact information and what should appear on paper." (*Id.*)

Finally, on October 26, 2012 and November 21, 2012, using the pseudonym "Charlie Buck," Fraser authored and posted to Contrarian Press's website articles about EMPO, one of which stated: "[W]e see [EMPO] as well-positioned in a newly-emerging stock sector." (*Id.* ¶ 92.) The articles did not disclose Fraser's authorship, his ownership of EMPO, or that EMPO made monthly payments to Contrarian Press, and the Contrarian Press website included the general disclaimer that stated: "The publisher . . . did not accept compensation in return for this commentary." (*Id.* ¶¶ 93–94.)

## II.  **Procedural History**

Plaintiff filed this action on July 6, 2016. (Doc. 1.) The Contrarian Defendants filed a motion to dismiss for improper forum or, in the alternative, a motion to transfer venue and supporting papers on February 17, 2017. (Docs. 37–39.) Plaintiff filed its opposition and supporting papers on March 10, 2017, (Docs. 40–42), and the Contrarian Defendants filed their reply papers on March 24, 2017, (Docs. 45–46). I denied the motion on September 29, 2017. (Doc. 50.)

On December 11, 2017, the Contrarian Defendants and Defendant Yeung separately filed motions to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Docs. 55, 58.) Plaintiff filed an amended complaint on January 22, 2018. (Doc. 62.) On March 5, 2018, the Contrarian Defendants filed the instant motion to dismiss the amended complaint, (Doc. 65), as well as a memorandum of law, (Doc. 66), and a notice of request for judicial notice, (Doc. 67), in support of their motion. On the same day, Defendant Yeung filed his current motion to dismiss the amended complaint, (Doc. 68), and a memorandum of law in support of the motion, (Doc. 70). On April 16, 2018, Plaintiff filed a memorandum of law in opposition to

5

both motions, (Doc. 73), and Defendants filed replies on May 7, 2018, (Docs. 74–75).

### III. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) requires a securities fraud claim to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This standard also requires

6

that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

## IV. Discussion

### A. *Primary Violations*

#### 1. Applicable Law

##### a. Section 17(b) of the Securities Act

Section 17(b) makes it unlawful to:

> publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q(b). Section 17(b) "was designed to protect the public from publications that 'purport to give an unbiased opinion but which opinions in reality are bought and paid for.'" *SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1105 (C.D. Ill. 2001) (quoting *United States v. Amick*, 439 F.2d 351, 365 (7th Cir. 1971)). Accordingly, the language of the statute is broad. *SEC v. Gagnon*, No. 10-cv-11891, 2012 WL 994892, at *10 (E.D. Mich. Mar. 22, 2012). To be liable under Section 17(b), a person must "(1) publish or otherwise circulate (using a means of interstate commerce), (2) a notice or type of communication (which describes a security), (3) for consideration received (past, currently, or prospectively, directly or indirectly), (4) without full disclosure of the consideration received and the amount." *Gorsek*, 222 F. Supp. 2d at 1105.

##### b. Section 10(b) of the Exchange Act and Rule 10b–5

Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder prohibit

7

fraud in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. While Rule 10b–5(b) targets misleading disclosures, Rules 10b−5(a) and (c) target deceptive conduct. *SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010); *see also Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 129 (2d Cir. 2011) ("Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance,' prohibits not only material misstatements but also manipulative acts.'") (quoting *ATSI Commc'ns*, 493 F.3d at 99); *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) ("'Conduct itself can be deceptive,' and so liability under § 10(b) or Rule 10b–5 does not require 'a specific oral or written statement.'") (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 158 (2008)).

To plead a Rule 10b–5(b) disclosure violation, the SEC must allege that the defendant (1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (setting forth requisite elements for private plaintiffs); *In re IBM Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (same); *see also Lee*, 720 F. Supp. 2d at 324–25 (stating that, unlike private litigants, the SEC is not required to prove investor reliance, loss causation or damages). To plead a deceptive conduct claim under Rules 10b–5(a) or (c), the SEC must allege that the defendant (1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; and (3) with scienter. *Lee*, 720 F. Supp. 2d at 325. A "manipulative or deceptive [act]" is "some act that gives the victim a false impression." *Finnerty*, 533 F.3d at 148.

### 2. Application

#### a. Contrarian Defendants – Section 17(b) of the Securities Act

For the First Promotional Campaign, Contrarian Press and Fraser "publish[ed] or otherwise circulate[d]" a "type of communication," *Gorsek*, 222 F. Supp. 2d at 1105, by authoring and publishing newsletters that touted the EMPO stock and encouraged investors to buy it, (*see, e.g.*, Am. Compl. ¶ 33 ("Contrarian Press issued a newsletter . . . which stated that '[EMPO] represents a solid growth stock'" that was "purported to be written by 'Charlie Buck.' 'Charlie Buck' was a pseudonym for Fraser, who was the true author of the [newsletter].").) These newsletters were distributed by email and/or direct mail. (*Id.* ¶ 42). The Contrarian Defendants received compensation for these newsletters, because, at the time they were published, EMPO was paying Contrarian Press between $14,500 and $19,500 per month to "provide a continuous stream of communication to the investing public . . . that expand[s] the active interest of new and current shareholders[.]" (*Id.* ¶¶ 30–31.) The newsletters did not disclose the fact or amount of the payment the Contrarian Defendants received as consideration; in fact, at least one newsletter stated that the "author . . . does not accept compensation from publicly traded companies in return for his commentary." (*Id.* ¶ 35.) Accordingly, the Amended Complaint satisfies all four of the *Gorsek* elements as to the Contrarian Defendants. *See* 222 F. Supp. 2d at 1105.

The Contrarian Defendants argue that Section 17(b) is the exclusive obligation of the publisher, and that Defendant Fraser cannot therefore be liable because he "is not alleged to have published" any of the newsletters that were a part of the First Promotional Campaign. (Contrarian Defs. Mem. 28.)[2] However, the Amended Complaint specifically alleges that

---

[2] "Contrarian Defs. Mem." refers to the Memorandum of Law in Support of Scott Fraser's and Contrarian Press'

"Fraser . . . distributed the Contrarian Press newsletters to subscribers by e-mail and/or direct mail." (Am. Compl. ¶ 42.) Moreover, even if the Amended Complaint had not specifically alleged that Fraser had published the newsletters, Fraser may be liable under Section 17(b) as a control person of Contrarian Press. *See Gagnon*, 2012 WL 994892, at *11.

Because Plaintiff has plausibly alleged all four elements of a Section 17(b) violation against the Contrarian Defendants, their motion to dismiss the Section 17(b) claim against them is denied.[3]

### b. Contrarian Defendants – Section 10(b) of the Exchange Act and Rule 10b–5

Plaintiff alleges that the Contrarian Defendants are liable under Rule 10b–5(b) for their conduct in the First Promotional Campaign and that they are liable under Rule 10b–5(a) and (c) for their conduct in the Second and Third Promotional Campaigns. (Am. Compl. ¶¶ 99–101; Pl. Opp. 27, 31.)[4]

First, with regard to the First Promotional Campaign and the violation of Rule 10b–5(b), the Contrarian Defendants made false statements and omissions when they claimed that the materials were authored by "Charlie Buck" who knew and interviewed Fraser. (Am. Compl. ¶¶ 33 ("I have known the founder, president, and CEO of [EMPO], Scott Fraser, for many years and I've watched the company grow from a small, private entity nine years ago to a rapidly

---

Motion to Dismiss the Amended Complaint with Prejudice, dated March 5, 2018. (Doc. 66.)

[3] The Contrarian Defendants also argue that Plaintiff failed to plausibly allege a Section 17(b) violation for the other promotional campaigns. (Contrarian Defs. Mem. 20–21; Contrarian Defs. Reply 9–10.) The Contrarian Defendants provide no legal authority suggesting that I must consider each campaign separately. Accordingly, because I find that the Section 17(b) claim survives on the basis of the Contrarian Defendants' conduct during the First Promotional Campaign alone, I need not consider the other promotional campaigns. "Contrarian Defs. Reply" refers to the Reply Memorandum in Further Support of Scott Fraser's and Contrarian Press' Motion to Dismiss Amended Complaint with Prejudice, dated May 7, 2018. (Doc. 74.)

[4] "Pl. Opp." refers to Plaintiff Securities and Exchange Commission's Opposition to Defendants' Motions to Dismiss the Amended Complaint, dated April 16, 2018. (Doc. 73.)

emerging publicly traded corporation today."), 39 (newsletters issued describing an "'interview with [EMPO's] CEO, Scott Fraser' and stating that they had 'known the founder, president, and CEO of Empowered Products, Scott Fraser, for many years'").) The First Promotional Campaign also included the false disclaimer that the "author . . . does not accept compensation from publicly traded companies in return for his commentary." (*Id.* ¶ 35.) These statements were false because "Charlie Buck" was a pseudonym for Fraser himself—a fact never disclosed to the public—and, as discussed above, EMPO paid Contrarian Press to promote its stock. (*Id.* ¶ 40.)

The Contrarian Defendants argue that Plaintiff has not adequately alleged that these misstatements were material, because they did not have any impact on stock price. (Contrarian Defs. Mem. 24–25.) This argument is misplaced and misses the mark, because—unlike investors—the SEC need not allege an impact on stock price when pleading Section 10(b) violations, and it meets the materiality requirement by "alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *see also Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 430 (S.D.N.Y. 2015) (noting that the determination of materiality for a Section 10(b) violation is "a mixed question of law and fact that generally should be presented to a jury") (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999)). A Section 10(b) claim may only be dismissed if the statement or omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. I find that reasonable minds could differ about whether the Contrarian Defendants' misstatements and omissions in the First Promotional Campaign were important, and that Plaintiff has adequately pleaded materiality. *Cf.*

11

*SEC v. Thompson*, 238 F. Supp. 3d 575, 599 (S.D.N.Y. 2017) ("Any receipt and amount of compensation are material information." (internal quotation marks omitted))).

Second, with regard to the Second and Third Promotional Campaigns and violation of Rule 10b–5(a) and (c), the Contrarian Defendants engaged in an elaborate scheme to deceive investors through the Second and Third Promotional Campaigns. For example: they (1) took steps to hide their involvement, (Am. Compl. ¶ 44); (2) arranged for their associates, who may have been EMPO employees, to promote EMPO, (*id.* ¶¶ 45–46); (3) hired Defendant Yeung to secretly promote EMPO and created a pseudonym email address for him, (*id.* ¶¶ 62–63); (4) instructed Fraser's assistant (a Contrarian Press employee) to create a front company to hide Contrarian Press' involvement in the campaigns, (*id.* ¶¶ 67, 73, 89); and (5) instructed stock promoters—using Yeung—to re-issue invoices to the front company instead of Contrarian Press to further hide their involvement in the campaigns, (*id.* ¶ 75). I find that these, and several additional acts described in the Amended Complaint, (*see, generally id.* ¶¶ 32–95), are the type of manipulative and deceptive acts that are prohibited by Rule 10b–5(a) and (c). *See, e.g.*, *Rabkin v. Lion Biotech., Inc.*, No. 17-cv-02086-SI, 2018 WL 905862, at *16–17 (N.D. Cal. Feb. 15, 2018) (denying a motion to dismiss a Rule 10b–5(a) and (c) claim involving similar allegations); *Hayes v. Browner*, 117 F. Supp. 2d 1182, 1193–94 (N.D. Okla. 2000) (same).

The Contrarian Defendants' argument that the Amended Complaint fails to allege that they "engaged in any deceptive conduct" has no factual support and ignores the myriad examples of deceptive conduct described above. (*See* Contrarian Defs. Mem. 13–16.) Therefore, the Contrarian Defendants' argument that Plaintiff is trying to make an end-run around Rule 10b–5(b) is also misguided because—as outlined above—the misstatements and deceptive conduct of the Contrarian Defendants are clearly alleged in the Amended Complaint. *See In re CytRx Corp.*

*Sec. Litig.*, No. CV 14-1956-GHK (PJWx), 2015 WL 5031232, at *12 (C.D. Cal. July 13, 2015) (finding that claim under Rule 10b–5(a) and (c) did not merely recast other actors' misstatements as a scheme where the complaint alleged "hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the Company's involvement"). Accordingly, I find that the Contrarian Defendants committed a manipulative or deceptive act in furtherance of a scheme to defraud. *See Lee*, 720 F. Supp. 2d at 325.

"[S]cienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (internal quotation marks omitted). I find that the Amended Complaint adequately pleads that Fraser was aware of his misstatements, omissions and deceptive acts, which appeared to be designed specifically to mislead. (*See* Am. Compl. ¶¶ 41, 49, 76, 91); *cf. Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010) (finding misstatements concerning a core operation of a company's business sufficient to establish scienter). The allegations establishing Fraser's scienter also impute scienter to Contrarian Press. *See SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 390 (S.D.N.Y. 2014) (finding that knowledge of CEO and largest individual shareholder could be imputed to a corporation).

### c. Yeung – Section 17(b) of the Securities Act

For the Third Promotional Campaign, Defendant Yeung took the following acts, among others, related to publication and circulation: (1) "hired stock promoters to distribute promotional materials about EMPO by e-mail to their subscribers"; (2) provided those promoters with promotional materials that he had received from EMPO's CEO, Defendant Fraser; and (3)

provided the promoters with the subject lines for the emails they would send to their subscribers. (Am. Compl. ¶¶ 68, 80, 82.) Plaintiff has therefore adequately alleged that Yeung "publish[ed] or otherwise circulate[d]" a "type of communication." *Gorsek*, 222 F. Supp. 2d at 1105. Contrarian Press paid Yeung $30,000 for this work in August 2012, therefore he received consideration, and Yeung was aware of the relationship between Contrarian Press and EMPO. (Am. Compl. ¶¶ 62, 84.) The promotions that were published by Yeung did not disclose the relationship between EMPO and Contrarian Press or the consideration he received indirectly from EMPO. (*Id.* ¶ 83; *see also* 15 U.S.C. § 77q(b).) Accordingly, the Amended Complaint satisfies all four of the *Gorsek* elements as to Defendant Yeung. *See* 222 F. Supp. 2d at 1105.

Yeung argues that Plaintiff has not adequately alleged that EMPO paid for the Third Promotional Campaign because the Amended Complaint states that the campaign materials included a link to a disclaimer that a different company, Alpine View, had paid for the advertisements, and because he did not have a quid pro quo relationship with an issuer, underwriter, or dealer. (Def. Yeung Mem. 13–15 (relying on *SEC v. Mapp.*, No. 4:16-CV-246, 2016 WL 5870576, at *9 (E.D. Tex. Oct. 7, 2016).)[5] These arguments ignore and are belied by the text of the statute itself, under which a person may be liable if he fails to disclose any "consideration received or to be received, directly *or indirectly*." 15 U.S.C. § 77q(b) (emphasis added). Plaintiff has alleged that EMPO paid Contrarian Press directly to promote its stock. (Am. Compl. ¶¶ 30–31.) Contrarian Press used those funds to pay Yeung, thereby providing him with indirect compensation from EMPO. (*Id.* ¶¶ 62, 84.) Yeung argues that the Amended Complaint fails because there is no specific allegation demonstrating that the $30,000 Contrarian

---

[5] "Def. Yeung Mem." refers to the Memorandum in Support of Nathan Yeung's Motion to Dismiss Plaintiff's Amended Complaint, dated March 5, 2018. (Doc. 70.)

14

Press paid to Yeung was for the Third Promotional Campaign and not for some other task Yeung performed. (Def. Yeung Mem. 17.) In support of this argument, Yeung relies on a case in which the court denied the SEC's motion for judgment as a matter of law at the conclusion of its case before a jury because "a juror could conclude that [the defendant's compensation was] not tied to distributing Promotional Materials, but [was] for other work performed. (*Id.* (citing *SEC v. Gebben*, 225 F. Supp. 2d 921, 926 (C.D. Ill. 2002).) In other words, the court was going to allow for this issue to be submitted to the jury. Rather than supporting dismissal, the *Gebben* case supports denying Defendant Yeung's motion to dismiss. In any event, at the motion to dismiss phase, I may not consider whether a juror might find in Defendant Yeung's favor; rather, I must draw all reasonable inferences in Plaintiff's favor, such as the inference that at least some of the $30,000 Yeung received from Contrarian Press compensation was for his work on the Third Promotional Campaign.

Yeung also argues that he cannot be held liable under Section 17(b) because he was merely a "functionary" who did not play an active role in developing the promotional materials for the Third Promotional Campaign. (*Id.* at 16.) However, as discussed above, the "language of Section 17(b) is broad," *Gagnon*, 2012 WL 994892, at *10, and does not hinge on the control a person has over the specific text in a publication, *see Gebben*, 225 F. Supp. 2d at 923, 925 (finding that the undisputed evidence showed that a non-controlling employee of a stock publishing company distributed promotional materials for the purposes of Section 17(b) by mailing, faxing, and making internet postings). Furthermore, the Amended Complaint alleges that Yeung did have a primary role in the Third Promotional Campaign, by hiring stock promoters to distribute EMPO promotional materials, creating promotional materials in collaboration with Contrarian Press employees, sending those materials to the stock promoters he

hired, and directing those stock promoters to download promotional material from a website Contrarian Press had established specifically for the purpose of the campaign. (Am. Compl. ¶¶ 68, 80, 82.)

Because Plaintiff has plausibly alleged all four elements of a Section 17(b) violation against Defendant Yeung, his motion to dismiss the Section 17(b) claim against him is denied.

### d. Yeung – Section 10(b) of the Exchange Act and Rule 10b–5

The SEC alleges that Defendant Yeung is liable under Rule 10b–5(a) and (c) for his conduct in the Third Promotional Campaign. (Am. Compl. ¶¶ 99–101; Pl. Opp. 36.)[6] Yeung argues that he "did not engage in any deceptive acts which deceived investors." (Def. Yeung Reply 10.)[7] To the contrary, the Amended Complaint alleges myriad deceptive acts in which Yeung participated. For example: Yeung (1) participated—at least in part—in the Third Promotional Campaign using a pseudonym; (2) obtained an email address and phone number associated with the pseudonym to make the pseudonym more believable; (3) switched to a different email address using the same pseudonym to mask his association with Contrarian Press, (Am. Compl. ¶¶ 63–64, 74); (4) obtained materials from EMPO's CEO, Fraser, promoting EMPO and distributed them to stock promoters without disclosing the source of the materials, (*id.* ¶¶ 80, 82); (5) instructed the stock promoters to re-issue invoices, sending them to a front

---

[6] Defendant Yeung argues that SEC's opposition brief impermissibly amends the Amended Complaint to include the Rule 10b–5(a) and (c) claim, instead of a Rule 10b–5(b) claim. (Def. Yeung Reply 7–8.) First, Yeung does not provide any authority to support his argument that a Rule 10b–5 claim must specify which subpart the claim is brought under. Second, Yeung's argument ignores the text in the Amended Complaint's third claim for relief, which alleges that all Defendants "employed devices, schemes, or artifices to defraud," and "engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person." (Am. Compl. ¶ 100.) Rule 10b–5(a) makes it unlawful to "employ any device, scheme, or artifice to defraud," and Rule 10b–5(c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. Accordingly, Plaintiff's opposition does not impermissibly amend the Amended Complaint.

[7] "Def. Yeung Reply" refers to the Reply Memorandum of Nathan Yeung in Support of His Motion to Dismiss Plaintiff's Amended Complaint, dated May 7, 2018. (Doc. 75.)

16

company instead of Contrarian Press purportedly because there were some errors in them "via contact information and what should be on paper," (*id.* ¶ 75); and (6) distributed the promotional materials that had been developed by Contrarian Press to stock promoters while deceiving them into believing that the front company was the promotion distributor, (*id.* ¶¶ 82–83, 86). Drawing all reasonable inferences in Plaintiff's favor, I conclude that these acts were intended to defraud.

The Amended Complaint alleges that Yeung "understood (or recklessly disregarded) that (a) he was undertaking the promotion for Contrarian Press and Fraser and (b) Fraser ran both Contrarian Press and EMPO" and that Yeung "knew (or recklessly disregarded) that the newsletter and the [Third Promotional Campaign] in general were deceptive." (Am. Compl. ¶ 84.) Yeung argues that Plaintiff fails to allege facts that, if established, would prove that Yeung acted with a reckless disregard for the truth. (Def. Yeung Mem. 26.) This argument is without merit. The Amended Complaint contains allegations that Yeung used a pseudonym, asked Contrarian Press employees for models of promotional materials, and used a model provided by Fraser—EMPO's President and CEO and the founder, owner, and President of Contrarian Press—when developing materials to send to stock promoters, and he directed the stock promoters to re-issue invoices to Contrarian Press's front company, Crown Pacifica. (Am. Compl. ¶¶ 63–64, 68–69, 73, 75, 80.) I find that these facts plausibly support the allegation that Yeung acted with, at minimum, a "reckless disregard for the truth." *See Obus*, 693 F.3d at 286.

## B. *Aiding and Abetting*

### 1. Applicable Law

To adequately allege a charge of aiding and abetting securities laws violations, the SEC must plead: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor;

17

and (3) 'substantial' assistance by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012) (citing *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)); *see also* 15 U.S.C. §§ 77o(b), 78t(e). "[T]to satisfy the 'substantial assistance' component of aiding and abetting, the SEC must show that the defendant in some way associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *Apuzzo*, 689 F.3d at 206 (internal quotation marks omitted).

### 2. Application

#### a. <u>Fraser</u>

Defendant Fraser does not appear to dispute that he aided and abetted Contrarian Press' violations with regard to the First Promotional Campaign in September and October 2011. (Contrarian Defs. Mem. 22 ("[T]here are no facts alleged to show that Mr. Fraser or Contrarian Press substantially assisted the 2012 Promotions.").) With regard to the Second and Third Promotional Campaigns, Fraser argues that Plaintiff fails to adequately plead any of the three elements. As discussed above, the Amended Complaint plausibly alleges that Contrarian Press is liable for primary violations of Section 17(b) and Section 10(b), and Fraser had knowledge of the violations. *See supra* Part IV.A.2. I find that, through the deceptive conduct described above, such as instructing his assistant to create a front company to hide Contrarian Press' involvement in the Second and Third Promotional Campaigns, (*see* Am. Compl. ¶¶ 67, 73, 89), Plaintiff has plausibly alleged that Fraser "sought by his action" to make Contrarian Press' violations succeed in deceiving investors, *see Apuzzo*, 689 F.3d at 206 (internal quotation marks omitted). Therefore, the Amended Complaint plausibly alleges that Fraser aided and abetted violations of Section 17(b), Section 10(b), and Rule 10b–5.

b. <u>Yeung</u>

Plaintiff alleges that Yeung aided and abetted the Contrarian Defendants' violations of Section 17(b) and Section 10(b). (Am. Compl. ¶¶102–104; Pl. Opp. 38–40.) Yeung does not dispute the primary violations of the Contrarian Defendants, rather he argues that Plaintiff fails to allege that he had knowledge of the violation or substantially assisted it. (Def. Yeung Mem. 27–29.)[8] I find that Plaintiff has plausibly alleged that Yeung had knowledge of the Contrarian Defendants' violations, including by alleging that Yeung took steps to conceal the fact that Contrarian Press paid the stock promoters that he hired, by asking them to submit invoices to the front company, Crown Pacifica, instead of Contrarian Press, and that he used a model provided by Fraser as a basis for the Third Promotional Campaign, but did not disclose Fraser's contributions. (Am Compl. ¶¶ 75, 80.) These alleged facts give rise to the reasonable inference that Yeung was aware of the Contrarian Defendants' violations. Yeung's use of the front company for interactions with the stock promoters, and his use of a pseudonym, (*see* Am. Compl. ¶¶ 63–64, 75), give rise to the inference that he took specific actions to make the violations succeed, *see Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 443 (S.D.N.Y. 2017) ("Substantial assistance exists where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.") (internal quotation marks omitted).

---

[8] Defendant Yeung's memorandum asks that I dismiss "Count IV of The Complaint . . . as To Mr. Yeung." (Def. Yeung Mem. 27.) Because the Fourth Claim for Relief of the Amended Complaint seeks relief for violations of Section 20(a) of the Exchange Act, does not seek relief against Defendant Yeung, and Yeung's argument in this portion of his brief relates to aiding and abetting liability, I assume that Yeung's reference to "Count IV" was a typographical error and that he meant his request to apply to the Third Claim for Relief.

### C. *Section 20(a) of the Exchange Act*

A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities law." *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud," *ATSI Commc'ns*, 493 F.3d at 108. "[W]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved in a motion to dismiss." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007) (quoting *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006)).

The Contrarian Defendants argue that Defendant Fraser is not liable under Section 20(a) of the Exchange Act because Plaintiff fails to adequately plead that Contrarian Press violated Section 10(b). (Contrarian Defs. Mem. 29.) As discussed above, Plaintiff has adequately alleged a Section 10(b) violation as to Contrarian Press. *See supra* Part IV.A.2.b. Accordingly, the Contrarian Defendants' motion to dismiss the Section 20(a) claim is denied.

### V. Conclusion

For the reasons stated above, Defendants' motions to dismiss are DENIED. The Clerk of Court is directed to terminate the open motions at Dkt. Nos. 65 and 68.

SO ORDERED.

Dated: March 13, 2019
     New York, New York

_____
Vernon S. Broderick
United States District Judge